**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| AIRBNB, INC., <br><br>                               Plaintiff, <br><br>        v. <br><br> THE CITY OF NEW YORK, <br><br>                             Defendant. | CIVIL ACTION NO. 18-cv-_____ <br><br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiff Airbnb, Inc. ("Airbnb"), by and through its undersigned counsel, for its Complaint against Defendant the City of New York (the "City"), alleges as follows:

### INTRODUCTION

1.      Local Law 2018/146, N.Y.C. Admin. Code § 26-2101–4 (the "Homesharing Surveillance Ordinance" or the "Ordinance") is an extraordinary act of government overreach. It is also the product of a multi-million dollar campaign funded by the City's powerful hotel lobby, which is intent on intimidating New Yorkers into abandoning homesharing.

2.      The Homesharing Surveillance Ordinance requires homesharing platforms to turn over an unprecedented amount of intimate personal data about their New York City hosts and whom they invite into their homes each month to a government enforcement agency—the Mayor's Office of Special Enforcement—that works shoulder to shoulder with private investigators hired and paid by the hotel lobby. No probable cause, notice, or legal review is contemplated in connection with the bulk collection of this data, and no real restrictions are placed on its use or dissemination. As such, the Ordinance is an unlawful end-run around established restraints on governmental action and violates core constitutional rights under the First and Fourth Amendments to the U.S. Constitution and Article I, Section 12 of the New York Constitution, as well as the federal Stored Communications Act, 18 U.S.C. §§ 2701 *et seq.*

3.     Under normal circumstances, government agencies may obtain private information about citizens only by following the strict legal processes that protect constitutional rights and provide for review and challenge.   The Homesharing Surveillance Ordinance evades those protections by mandating—under threat of newly-created legal liability—that Internet platforms holding the sought-after data obtain blanket, advance "consent" from their users and then automatically surrender the demanded data to the City's enforcement agency every month. Because users of these platforms have no opportunity to challenge this turnover of data to the Office of Special Enforcement, the City is betting that they will walk away from homesharing.

4.     More specifically, the Ordinance targets data concerning New Yorkers who share their homes with travelers on a short-term basis using an Internet homesharing platform like Airbnb.  For each instance in which a New York City residence is rented on a short-term basis using such a platform, the Homesharing Surveillance Ordinance requires that the platform turn over to the City's enforcement agency on a monthly basis:

a.     the address of the residence;

b.     the full legal name, address, telephone number, and email address of the host;

c.     the specific identifiers (name, number, and URL) of both the home and the host on the homesharing platform;

d.     a statement of when and how the residence was occupied;

e.     the total number of days the residence was rented;

f.     the fees received by the platform; and

g.     if the platform collects rent, the amount paid and host bank account information.

5.     Thus, the Ordinance requires Internet homesharing platforms to turn over personal information about their hosts, much of which is not made public through the platforms.  The Ordinance also requires homesharing platforms to turn over their own non-public and commercially sensitive information, including detailed breakdowns of revenues and technical information about listings.  To the extent a platform collects rent, it is also required to hand over highly sensitive bank account information about how guests choose to pay and how much.  All of this is data the Office of Special Enforcement could not otherwise obtain without precompliance review, and the Ordinance permits that agency to use and share the data however and whenever it chooses, without any meaningful limitation.  In so doing, the Ordinance breaches critical privacy protections both for homesharing platforms like Airbnb and for the New Yorkers who share their homes on these platforms.

6.     Put another way, the Homesharing Surveillance Ordinance requires Airbnb to report on a monthly basis volumes of otherwise private information about who New Yorkers choose to invite into their homes, where those homes are located, when and for how long the guests stay, and what the guests are doing there.

7.     As the Supreme Court has recognized, "when it comes to the Fourth Amendment, the home is first among equals.  At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'"  *Florida* v. *Jardines*, 569 U.S. 1, 6 (2013) (quoting *Silverman* v. *United States*, 365 U.S. 505, 511 (1961)).  Indeed, "the overriding respect for the sanctity of the home . . . has been embedded in our traditions since the origins of the Republic."  *Payton* v. *New York*, 445 U.S. 573, 590 (1980).  The Homesharing Surveillance Ordinance is inconsistent with these fundamental principles.

8.      City Council members and other State and City officials claim that this extreme governmental surveillance is somehow necessary because housing is being taken off the market illegally for use as short-term rentals and thereby driving up housing costs.  As of June 1, 2018, however, there are only about 28,000 "entire home" Airbnb listings spread across New York City—approximately 0.8 percent of New York City homes.  Moreover, 95% of hosts listing an entire home on Airbnb have only a single home offered—hardly a threat to the City's housing stock.

9.      City officials also claim that the Homesharing Surveillance Ordinance was designed to combat illegal hotel operators, but the Ordinance makes no distinction between commercial operators and the ordinary New Yorkers who use Airbnb's homesharing platform to supplement their income so they can afford to remain in their homes and support their families.

10.      The reality is the Ordinance is the product of a lobbying campaign funded by the hotel industry, which believes it is being threatened by homesharing and has co-opted the very agency—the Office of Special Enforcement—that will receive and exploit the data.

11.      The Homesharing Surveillance Ordinance provides that enforcement agency with a complete picture into New York homesharing without the need for probable cause, notice, legal process, or review.  The Office of Special Enforcement will be able to use the compelled information for whatever nefarious purpose it desires without a need to articulate a reasonable relation to any particular investigation.  Office of Special Enforcement agents already are using data from servers purchased from data-mining company Palantir—including data collected and supplied to the agency by the hotel lobby's private investigators—to turn up unannounced at New Yorkers' private homes to harass homesharing hosts and guests and issue citations for alleged violations (many of which are subsequently dismissed upon challenge).

12.     Even worse, nothing in the Homesharing Surveillance Ordinance secures the data. For example, nothing in the Ordinance prevents the Office of Special Enforcement from sharing the data with other agencies or turning the data over to any member of the public—including individuals associated with the hotel lobby—who files a request under the Freedom of Information Law.

13.     Given the above, it should come as no surprise that this surveillance regime far exceeds in scope and severity the regulations imposed on any other industry in New York City. New York City hotels are not required to disclose this same information about all of their patrons' stays.

14.     In sum, the systematic, ongoing, bulk surveillance mandated by the Homesharing Surveillance Ordinance is illegal.  The Ordinance requires Airbnb and other homesharing platforms to communicate a chilling message to their users under the guise of obtaining "consent" and then to surrender to the City an extraordinary amount of commercially sensitive and personal information about their hosts without cause or protection.  This unprecedented end-run around restraints on governmental action warrants this Court's intervention.

## OVERVIEW OF CLAIMS

15.     Plaintiff Airbnb brings this action under 42 U.S.C. § 1983, 18 U.S.C. § 2707 and 28 U.S.C. § 2201 to declare unlawful Chapter 21 of Title 26 of the New York City Administrative Code and to enjoin its enforcement.

16.     The Homesharing Surveillance Ordinance violates the Fourth Amendment to the U.S. Constitution because it authorizes warrantless searches of Airbnb's private business records without any opportunity for precompliance review.  The information sought under the Ordinance is highly sensitive and proprietary commercial and personal data in which Airbnb has a reasonable expectation of privacy.

17.     For the same reasons, the Homesharing Surveillance Ordinance also violates Article I, Section 12 of the New York State Constitution.

18.     In addition, the Homesharing Surveillance Ordinance directly conflicts with, and is preempted by, the Stored Communications Act, 18 U.S.C. §§ 2701 *et seq.* (the "SCA"), because it compels Airbnb to disclose host information to the City without the legal process or consent required by the SCA.   Indeed, one of Congress' goals in enacting the SCA was to protect the privacy of data belonging to customers of electronic communication service providers like Airbnb. *See* S. Rep. No. 99-541, at 1 (1986).   The Ordinance squarely conflicts with that Congressional objective.

19.     Finally, the Homesharing Surveillance Ordinance violates the First Amendment insofar as it "compel[s] [Airbnb] to speak a particular message."  *Nat'l Inst. of Family & Life Advocates* v. *Becerra,* 138 S. Ct. 2361, 2371 (2018).  Airbnb will be forced to communicate a City-mandated message that users of Airbnb's homesharing platform must consent to the production of their sensitive personal and financial information, that their mere use of the platform will constitute consent to the disclosure of that information, and that their information will be turned over to a special government agency that targets New Yorkers who participate in homesharing.

## THE PARTIES

20.     Plaintiff Airbnb is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business in San Francisco, California.   Airbnb is a homesharing platform; it maintains a website and mobile applications that provide access to an online marketplace for people to list, explore, and book both short-term and long-term housing accommodations.

21.     Defendant the City of New York is an incorporated municipality within the State of New York.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983 because Airbnb alleges violation of its rights under the Constitution and laws of the United States.

23.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Airbnb's claims arising under the New York State Constitution because they are so related to the federal claims asserted in this action that they form part of the same case or controversy under Article III of the U.S. Constitution.

24.     The Court may declare the legal rights and obligations of the parties in this action pursuant to 28 U.S.C. § 2201 because the action presents an actual controversy within the Court's jurisdiction.

25.     Venue is proper under 28 U.S.C. § 1391 because the defendant is located and resides in this judicial district and in the State of New York, and because a substantial part of the events giving rise to the claims for relief occurred in this judicial district, or in the alternative, because the defendant is subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS

### Homesharing and Airbnb

26.     "Homesharing" is the renting of one's own home to travelers.  This is not a new concept, but the Internet has made it easier and more accessible for people around the globe. Websites and Internet applications provide a platform that facilitates the matching of travelers looking for a place to stay (guests) with local people looking to share their spaces (hosts) and then provides the means to enter into an agreement, securely communicate, and pay for the stay.

27.     Founded in 2008, Airbnb is a homesharing platform with the mission of creating a world where people can belong when they travel by being connected to local cultures and having unique travel experiences.

28.     As of June 1, 2018, there were approximately 27,500 "entire home" Airbnb listings spread across New York City.  In terms of the overall housing stock, that amounts to approximately 0.8 percent of New York City homes.

29.     The overwhelming majority of Airbnb hosts in New York City are individuals who have only one listing on the platform.  Indeed, as of June 1, 2018, 95% of hosts who rent out full homes in New York City are individuals with just one listing.

30.     Often Airbnb listings are outside of the typical tourist zones and offer more affordable accommodations than traditional commercial options.

31.     Publicly-available data shows that Airbnb has a significantly positive impact on local communities, including those within New York City.

32.     More than 700,000 short-term rental bookings were made through Airbnb's platform in New York City in 2016, generating roughly $2.8 billion in economic activity and supporting approximately 30,000 jobs in New York City.

33.     In many cases, the supplemental income hosts earn is what enables them to afford to remain in their homes.  Indeed, in an annual survey, 77% of Airbnb hosts in New York reported that they use the money they earn sharing their homes to remain in their homes, 28% of hosts reported that homesharing has helped them avoid eviction, and another 18% reported that homesharing has helped them avoid foreclosure.

34.     The beneficial effects of the Airbnb platform are even more pronounced in low-income neighborhoods.  The median supplemental income of an Airbnb host in New York City's

low-income neighborhoods was more than $4,500 for the year ending July 1, 2016—the equivalent of a 13% boost to median household income in these communities. A typical family in these communities can increase its median monthly income by 10% by renting out its apartment for a single three-day weekend.

35.     The beneficial effects of Airbnb are likewise more pronounced in minority communities. Homesharing through the Airbnb platform generated nearly $60 million in income for hosts in predominantly Hispanic neighborhoods in 2016, more than $70 million in income for hosts in predominantly African American neighborhoods in 2017 (which was up 63% from 2016), and more than $20 million in income for hosts in predominantly Chinese American neighborhoods.

36.     A National Bureau of Economic Research working paper published earlier this year estimated that in ten major U.S. cities, "consumer surplus would decrease by $276 million" in one year if not for Airbnb. Indeed, the working paper found an average of "a consumer surplus of $41 per night for every Airbnb booking," with New York City gaining a consumer surplus of $42 per night for every Airbnb booking.[1]

**Hosts and Guests Provide Sensitive Personal Information to Airbnb**

37.     In using the Airbnb platform, hosts and guests input sensitive personal information into Airbnb's systems.

38.     Before anyone can use the Airbnb platform, as a host or guest, they must first become a member of Airbnb. To sign up as a member on the Airbnb website, a user clicks the "Sign up" link at the top right of the homepage, www.airbnb.com. Users can also sign up using Airbnb's mobile app.

---

[1] Chiarra Farronato & Andrey Fradkin, The Welfare Effects of Peer Entry in the Accommodation Market: The Case of Airbnb, National Bureau of Economic Research (February 2018) at 6, 50, http://www.nber.org/papers/w24361.

39.    In signing up, the user then submits certain identifying information (or enters their Facebook or Google credentials) and clicks "Sign up":



40.   After clicking "Sign up," the user is prompted to accept Airbnb's Community Commitment, Terms of Service, Payments Terms of Service, Privacy Policy, and Nondiscrimination Policy, all of which are mandatory to use the platform.  A user can read each of those documents by clicking the appropriate link.



41.    To become a "host," a user creates a listing for their accommodation on the platform, and provides descriptions, images and videos, prices, and dates of availability for the space:



42.    A typical Airbnb listing shows the general location, basic description, and the host's first name.  Listings do not include a host's full name, email address, or telephone number, nor do they disclose the listing address.   All of that information is kept by Airbnb in its non-public systems.

43.     Thus, while guests can search listings by location, dates, or other criteria, in order to protect the privacy and security of the hosts, the platform does not disclose full host names or listing addresses in search results.

44.     Once guests have identified accommodations in which they may be interested, guests and hosts can use the platform to securely and privately message each other.  Such communications may contain terms or conditions of the stay or other aspects of the agreement between the host and the guest.

45.     If a guest and a host reach an agreement, the platform then (and only then) securely discloses the listing address to the guest.

46.     The Airbnb platform also provides a secure payment-processing service through which the guest pays the host electronically.

47.     Airbnb keeps users' sensitive personal information private and uses it for purposes of facilitating Airbnb transactions, such as to provide customer service, enable communications between users, and monitor for fraud.  Airbnb discloses sensitive personal information to governmental entities only in response to valid legal requests.  Given the above, Airbnb hosts and guests have a reasonable expectation of privacy in the non-public information they share with Airbnb.

**The Hotel Industry Views Homesharing as a Threat and Has Launched an Aggressive Attack to Stop It**

48.     The popularity of homesharing platforms like Airbnb is viewed as a threat by the traditional hotel industry in New York City because homesharing provides travelers a unique and often less expensive alternative to the City's high-priced hotels.  This limits the ability of hotels to charge gouging rates at peak times and in areas of high concentration.  In 2015, Jon Bortz, chief executive of Pebblebrook Hotel Trust, which at the time owned Embassy Suites, Doubletree, and

other hotels, said that Airbnb limited the company's "ability to price at what maybe the customer would describe as sort of gouging rates."[2]

49.    As a recent *Forbes* article explained, "Airbnb is revolutionizing the lodging market by keeping hotel rates in check and making additional rooms available in the country's hottest travel spots during peak periods when hotel rooms often sell out and rates skyrocket."[3]  "That's bad news for hotels . . . [a]nd it's good news for travelers."[4]

50.    As a result, while hotels are having some of their best years on record, the hotel lobby is spending millions to attack homesharing.

51.    One of the hotel lobby's main tools for thwarting homesharing is exerting influence over the legislative process.  In the hotel lobby's own words:  "*Objective:  Build on the success of 2016 efforts to ensure comprehensive legislation in key markets around the country and create a receptive environment to launch a wave of strong bills at the state level while advancing a national narrative.*"[5]

**The Hotel Lobby Uses New York City Officials to Thwart Airbnb**

52.    In New York City, since at least 2013, the hotel lobby has mounted an aggressive campaign to stamp out the competitive threat posed by Airbnb, spending vast sums of money

---

[2] Elizabeth Dwoskin, Hotel CEO openly celebrates higher prices after anti-Airbnb law passes, THE WASHINGTON POST (Oct. 26, 2016), https://www.washingtonpost.com/news/the-switch/wp/2016/10/26/hotel-executive-openly-celebrates-higher-prices-after-anti-airbnb-law-passes/.

[3] Dina Gerdeman, The Airbnb Effect: Cheaper rooms for Travelers, Less Revenue for Hotels, FORBES.COM (Feb. 27, 2018), https://www.forbes.com/sites/hbsworkingknowledge/2018/02/27/the-airbnb-effect-cheaper-rooms-for-travelers-less-revenue-for-hotels/.

[4] *Id.*

[5] The Hotel Industry's Plans to Combat Airbnb, Pages from a 2016 American Hotel and Lodging Association document outlining plans to fend off Airbnb in the coming year, N.Y. TIMES (Apr. 16, 2017), https://www.nytimes.com/interactive/2017/04/16/technology/document-hotel-industry-plans-to-combat-airbnb-excerpt.html.

funding attacks against homesharing platforms, and supporting candidates for office whom it believes will push government efforts to obstruct homesharing. This powerful lobby has also focused its efforts on co-opting the Office of Special Enforcement.

53.     Created in 2006, the Office of Special Enforcement has responsibility for "overseeing response to conditions at properties throughout the City that threaten quality of life and require a coordinated response from multiple agencies or otherwise demand special attention" including inspections, investigations and "implementation of other remedies by such agency staff for violation of the City's Building, Fire Prevention and Health Codes." Mayor's Exec. Order No. 96 § 2 (NYC 2006).

54.     The Office of Special Enforcement originally was intended to be an expansion of a decades-old effort to improve public safety and quality of life in midtown Manhattan through the Office of Midtown Enforcement. In its early years, the Office of Special Enforcement cracked down on counterfeit products, went after video piracy, and enforced the City's noise code.

55.     Beginning in 2013, however, the mission, budget, and practices of the Office of Special Enforcement changed dramatically, as the hotel lobby began to implement its strategy to have the agency target homesharing.

56.     Since 2013, the hotel lobby has given at least $460,217 to members of the New York City Council, as well as $235,404 to Mayor Bill de Blasio and $46,850 to Comptroller Scott Stringer. In the 2017 elections, the New York Hotel and Motel Trades Council ("HTC") spent $395,498 on seven City Council races through its Hotel Workers for Stronger Communities group—the most of any independent group.

57.     Not long after the 2013 elections, the mission of the Office of Special Enforcement began to shift toward a focus on targeting homesharing. The transition was overseen by the

agency's Director at the time, Elan Parra.   Under Parra's leadership, the Office of Special Enforcement in 2014 issued approximately 1,200 violations relating to homesharing.

58.     Also, shortly after Mayor de Blasio took office, the City purchased 24 "Gotham" server cores from Palantir, Inc. ("Palantir")—at a cost of nearly a million dollars.   The Gotham server cores include highly sophisticated technology that aggregates and synthesizes data from various sources into a common format and a single database.   The master Gotham database retains this aggregated data even if the original source data is later removed or deleted.

59.     After the City purchased the Gotham server cores, it acquired licenses for a Palantir mobile technology that allows users to access the master Gotham database from a smartphone. That technology was quickly rolled out to Office of Special Enforcement agents.   In the words of one press report, this mobile technology "connect[s] them to everything the City knows about every place within it."   Another press report explained that Office of Special Enforcement agents use the technology to "catch Airbnb hosts."

60.     In mid-June 2015, with the focus of the Office of Special Enforcement shifted to homesharing and with the Palantir technology in place, Parra left the agency and went to work for the hotel lobby.   On July 20, 2015, a consulting firm named Lemire LLC announced that Parra had joined as Managing Director.   Lemire was retained by and works on behalf of the Hotel Association of New York City ("HANYC").   The day after the announcement of Parra's move to Lemire, the City announced that it was doubling the Office of Special Enforcement's budget, in an effort to transform the agency into an active investigation and enforcement unit with a proactive mission targeted at homesharing.

61.     Parra maintained close ties with Office of Special Enforcement personnel after his move to Lemire.   And as early as August 2015, Parra and the Office of Special Enforcement began

coordinating their efforts to attack Airbnb and its homesharing hosts.  For example, on August 10, 2015, an Office of Special Enforcement official forwarded an invitation to an Airbnb Happy Hour to Parra with the subject line "*Great U/C [undercover] Opportunity*."  The official suggested to Parra that they could "*infiltrate, get some insight and then vacate the party*."

62.     In November 2015, Jason Ortiz—a managing director at another hotel-industry-affiliated consulting firm, Metropolitan Public Strategies ("MPS")—left MPS and rejoined HTC as its deputy director.  Almost immediately, HTC gave $100,000 to HANYC for what public disclosures called a "BNB Campaign"—an apparent reference to Airbnb.  The close coordination between hotel groups and the Office of Special Enforcement escalated.

63.     Upon information and belief, by 2017, the Office of Special Enforcement had effectively outsourced a substantial portion of its investigatory work to private hotel groups, including Lemire.  The agency was, at the very least, relying on "dossiers" that Lemire investigators provided to the agency "wrapped in a bow."[6]  And the agency reported in mid-2017 that it was spending 95% of its time on enforcement efforts related to homesharing.

64.     The Office of Special Enforcement can and does serve subpoenas, warrants, and other legal process on Airbnb for information about hosts in connection with its enforcement efforts.  As in all other cities in the United States, this general procedure is both constitutional and legal when done properly—it is targeted in nature, provides for precompliance review of such process, and generally allows notice to be provided to users who have the opportunity to object for themselves in advance of their information being produced.

---

[6] Josh Eidelson, Hotel Money Is Funding Anti-Airbnb Sting Operations, BLOOMBERG BUSINESSWEEK (July 12, 2017), https://www.bloomberg.com/news/articles/2017-07-12/hotel-money-is-funding-anti-airbnb-sting-operations

65.     Airbnb complies with such legal process and provides information sufficient to meet the OSE's investigative needs with appropriate precompliance review.

66.     Following legal process, however, apparently has not satisfied the Office of Special Enforcement and its hotel lobby allies.

**The Homesharing Surveillance Ordinance Threatens Private Information Without Cause or Protection**

67.     The Homesharing Surveillance Ordinance is the latest chapter in the hotel lobby's campaign against Airbnb and the everyday New Yorkers who use its platform.   Indeed, the Ordinance is exactly the kind of "comprehensive legislation" that the hotel lobby identified as a priority in late 2016.

68.     The Homesharing Surveillance Ordinance was passed by the City Council on July 18, 2018, and signed into law by Mayor de Blasio on August 6, 2018.  It is scheduled to go into effect in February 2019.

69.     Under the Ordinance, online homesharing platforms are required to "[s]ubmit to the [Office of Special Enforcement] . . . a report of transactions . . . on a monthly basis."  N.Y.C. Admin. Code § 26-2102(a).  These monthly transaction reports must include, among other things, for every short-term rental through the platform:

> (1)     The physical address of the short-term rental associated with such transaction, including the street name, street number, apartment or unit number, borough or county, and zip code;
>
> (2)     The full legal name, physical address, phone number and email address of the host of such short-term rental and the uniform resource locator (URL) and the individualized name and number of such host on such booking service's platform;
>
> (3)     The individualized name and number and the URL of such advertisement or listing;
>
> (4)     A statement as to whether such short-term rental transaction involved (i) short-term rental of the entirety of a dwelling

unit or housing accommodations in a building or (ii) short-term rental of part of such unit or housing accommodations;

(5)    The total number of days that the dwelling unit, part thereof or housing accommodations in a building were rented as a short-term rental through such booking service's platform;

(6)    The total amount of fees received by such booking service for such short-term rental; and

(7)    If such booking service collects rent for short-term rentals on behalf of such host, (i) the total amount of such rent received by such booking service and transmitted to such host and (ii) the account name and consistently anonymized identifier for the account number for the account used by such host to receive payments from such booking service or, if such booking service provides an explanation why such anonymized identifiers are unavailable, the account name and account number for such account.

70.    If allowed to go into effect, these provisions would require Airbnb to turn over personal information of its hosts that is not made publicly available through the platform, including the full legal names, home addresses, telephone numbers, and email addresses of hosts, as well as detailed information about how they use their private property and whether and when they invite others into their homes.  To the extent a homesharing platform "collects rent," the Ordinance also requires the production of sensitive bank account information.  N.Y.C. Admin. Code § 26-2102(7).

71.    The information that the Ordinance compels Airbnb to produce will enable the City to identify, contact, target, and monitor tens of thousands of hosts, including those who are hosting *legally* and should not in any way be a target of the Office of Special Enforcement.  Indeed, the Ordinance requires the disclosure of data about all hosts, regardless of whether the City believes or even suspects they are engaged in unlawful behavior.

72.    These provisions also would require Airbnb to turn over its own non-public and competitively sensitive information, including detailed breakdowns of its revenues, and technical information about the listings on its platform.

73.     Airbnb would be required to turn this data over to the very agency that has been co-opted by the hotel lobby, and which wields its authority to attack Airbnb and the everyday New Yorkers who use Airbnb's homesharing platform.

74.     The Homesharing Surveillance Ordinance provides no mechanism for any person to challenge the improper disclosure, retention, or dissemination of this intimate data.  Nothing in the Ordinance prevents the Office of Special Enforcement from uploading the information directly into Palantir's Gotham database and making it available to every agency and official in the City, including law enforcement.  Indeed, there is every reason to believe the Office of Special Enforcement will do exactly that.

75.     Although the Homesharing Surveillance Ordinance provides that information included in the transaction reports "shall be available for public review only to the extent required by federal, state and local law," *see* N.Y.C. Admin. Code § 26-2105, that provision does not by its terms prevent the Office of Special Enforcement from sharing the data with other government agencies or officials, or from turning the data over to *any member of the public* (including the hotel lobby) who files a request under New York's Freedom of Information Law.

76.     Separately, the Homesharing Surveillance Ordinance also requires Airbnb to obtain "consent from the person offering such unit for short-term rental to provide the information" required to be produced.  N.Y.C. Admin. Code § 26-2102(b).  It specifies that the requirement to obtain "consent" may include "advising or providing notice to a user of the booking service that new or continuing use of such booking service as a host constitutes consent to such disclosure." *Id.*

77.     As written, even if a host does not affirmatively consent, Airbnb is still required to disclose information about a listing without any required legal process.  *See id.*  There is simply no mechanism in place for a host to opt out.

78.     A homesharing platform like Airbnb that fails to submit a transaction report with the required information is subject to a civil penalty, "to be assessed once per reporting period for each set of records corresponding to a listing which is missing, incomplete or inaccurate," of "not more than the greater of $1,500 or the total fees collected during the preceding year by the booking service for transactions related to the listing."  N.Y.C. Admin. Code § 26-2104.

79.     While the Homesharing Surveillance Ordinance goes into effect on February 2, 2019, the Office of Special Enforcement is authorized to "take such measures as are necessary for its implementation, including the promulgation of rules, before such effective date."  This means that implementation of the new statute could begin immediately.  *See* N.Y.C. Admin. Code § 26-2104(2).

80.     In addition, prior to the effective date, Airbnb will be required to take steps to prepare for compliance, at significant cost to the company, including:  (i) notifying tens of thousands of hosts of the City's new regulatory regime and seeking their "consent" to disclose their personal information; (ii) creating new processes and controls and revising its systems to ensure that it only lists properties where hosts have provided "consent" to disclosure of their personal information; and (iii) devising a system to collect and confirm the pertinent data and produce the required monthly transactional reports to the Office of Special Enforcement.

**The Homesharing Surveillance Ordinance Is Unprecedented**

81.     The Homesharing Surveillance Ordinance is unprecedented among City laws in the level, frequency, and manner of disclosure of third-party information that it compels.  In no other industry or context does the New York City Administrative Code require companies to disclose

such detailed and sensitive information about third parties on such a frequent basis.  To the contrary, in the handful of industries or contexts where the Code requires companies to turn over information about the third parties who use their products or services, those requirements are narrowly tailored and tied to specific and legitimate interests on the City's part.  They do not come close to the degree of disclosure compelled here.

82.    The unprecedented nature of the Homesharing Surveillance Ordinance is underscored by a comparison to the regulation of the hotel industry.  *No provision of the New York City Administrative Code requires hotels to disclose detailed information about their patrons or their stays.*  And most hotels would balk at any suggestion that their patrons' privacy could be invaded in such a manner.

83.    Airbnb is not aware of any other municipality in the United States that requires disclosure by online homesharing platforms as broad or frequent as the disclosure mandated by the Homesharing Surveillance Ordinance.  Neither New York City nor any other city, nor any state, nor the federal government has ever tried forcing the disclosure to law enforcement of personal information about *every* user of an online service simply because some may use the service to break the law.

## CLAIMS

### COUNT I – VIOLATION OF THE FOURTH AMENDMENT TO THE U.S. CONSTITUTION AND CLAIM FOR INJUNCTIVE RELIEF, PURSUANT TO 42 U.S.C. § 1983 AND THE COURT'S EQUITABLE POWERS

84.    Plaintiff incorporates all of the preceding paragraphs as if fully set forth herein.

85.    Plaintiff is informed and believes, and based upon such information and belief alleges, that in doing all of the things herein mentioned, defendant acted under color of the statutes, regulations, customs and usages of the City of New York and the State of New York for purposes of establishing "state action" under 42 U.S.C. § 1983.

86.     The Fourth Amendment to the U.S. Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  The Fourth Amendment applies to the States by virtue of the Fourteenth Amendment to the U.S. Constitution.

87.     Airbnb has a reasonable expectation of privacy in its business records.  The transaction reports required by the Ordinance contain confidential information relating to users of Airbnb's homesharing platform and commercially sensitive information about Airbnb's business. Airbnb takes various measures to guard such confidential business information from public disclosure, which is crucial for Airbnb to maintain its business success.

88.     Airbnb's hosts also have privacy interests in the non-public personal information they disclose to Airbnb.  Hosts expect that their private information will be used only for the limited purposes outlined in Airbnb's Privacy Policy.  And Airbnb shares the interests of its hosts in maintaining their privacy, so that hosts will continue to have confidence in Airbnb's homesharing platform.

89.     The Fourth Amendment prohibits the government from executing an administrative search unless the subject of the search has "an opportunity to obtain precompliance review before a neutral decisionmaker."  *City of Los Angeles. Calif.* v. *Patel*, 135 S. Ct. 2443, 2451-52 (2015).

90.     The Homesharing Surveillance Ordinance violates the Fourth Amendment to the U.S. Constitution because the Ordinance improperly authorizes the City, through the Office of Special Enforcement, to execute an administrative search without any form of precompliance review.

91.    Pursuant to 42 U.S.C. § 1983 and the Court's equitable powers, Airbnb seeks injunctive relief against the City, whose enforcement of the Homesharing Surveillance Ordinance would violate the Fourth Amendment.

### COUNT II - VIOLATION OF ARTICLE I, § 12 OF THE NEW YORK STATE CONSTITUTION AND CLAIM FOR INJUNCTIVE RELIEF, PURSUANT TO 28 U.S.C. § 1367 AND THE COURT'S EQUITABLE POWERS

92.    Plaintiff incorporates all of the preceding paragraphs as if fully set forth herein.

93.    Like the Fourth Amendment to the U.S. Constitution, Article I, Section 12 of the New York State Constitution protects "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures."

94.    In fact, the New York Constitution is more solicitous of personal privacy interests than the U.S. Constitution.  "New York's State Constitution, article I, § 12, affords greater protection against warrantless searches than the U.S. Constitution."  *5 Borough Pawn, LLC* v. *City of New York*, 640 F. Supp. 2d 268, 278 (S.D.N.Y. 2009).

95.    Airbnb has a reasonable expectation of privacy in its business records.  The transaction reports required by the Ordinance contain confidential information relating to users of Airbnb's homesharing platform and commercially sensitive information about Airbnb's business.  Airbnb takes various measures to guard such confidential business information from public disclosure, which is crucial for Airbnb to maintain its business success.

96.    Airbnb's hosts also have privacy interests in the non-public personal information they disclose to Airbnb.  Hosts expect that their private information will be used only for the limited purposes outlined in Airbnb's Privacy Policy.  And Airbnb shares the interests of its hosts in maintaining their privacy, so that hosts will continue to have confidence in Airbnb's homesharing platform.

97.     The Homesharing Surveillance Ordinance violates Article I, § 12 of the New York State Constitution because the Ordinance improperly authorizes the City, through the OSE, to execute an administrative search without any form of precompliance review.

98.     Pursuant to Article I, § 12 of the New York State Constitution, 28 U.S.C. § 1367, and the Court's equitable powers, Airbnb seeks injunctive relief against the City, whose enforcement of the Homesharing Surveillance Ordinance would violate the New York State Constitution.

**COUNT III – VIOLATION OF AND PREEMPTION BY THE STORED COMMUNICATIONS ACT, 18 U.S.C. §§ 2701 ET SEQ., AND CLAIM FOR INJUNCTIVE RELIEF, PURSUANT TO 18 U.S.C. § 2707, 42 U.S.C. § 1983, AND THE COURT'S EQUITABLE POWERS**

99.     Plaintiff incorporates all of the preceding paragraphs as if fully set forth herein.

100.    Under the SCA, "a provider of remote computing service or electronic communication service to the public shall not knowingly divulge a record or other information pertaining to a subscriber to or customer of such service . . . to any governmental entity," without a subpoena or other legal process, unless permitted by one of the exceptions, none of which applies here.  18 U.S.C. §§ 2702(a)(3), (c)(1); 2703(c).

101.    Airbnb is a provider of an electronic communication service within the meaning of the SCA, because it provides its users with "the ability to send or receive wire or electronic communications," by, among other things, allowing hosts and guests to private and securely message each other through the service.  18 U.S.C. § 2510(15).  Airbnb also is a provider of a remote computing service within the meaning of the SCA, because it provides its users "computer storage or processing services by means of an electronic communications system," by, among other things, allowing users to create listings and store photographs, documents, and correspondence.  *Id.* § 2711(2).

102.   The City is a municipality within the State of New York, and thus qualifies as a "governmental entity" under the SCA.  *See id.* § 2711(4).

103.   The Homesharing Surveillance Ordinance requires that homesharing platforms submit a monthly report that includes the full legal name, physical address, phone number and email address of the host, a statement regarding the nature of each rental, the total number of days that each unit was rented, the fees received by Airbnb, and other information.  N.Y.C. Admin. Code § 26-2102.

104.   These provisions violate and conflict with the SCA, and harm the rights of Airbnb and its hosts, because they require Airbnb to "divulge a record or other information pertaining to a subscriber to or customer of such service" to a "governmental entity," without a subpoena or other form of legal process. 18 U.S.C. §§ 2702(a)(3), 2703(c).  These provisions of the Homesharing Surveillance Ordinance also interfere with or impede the accomplishment of the full purposes and objectives of federal law.  Accordingly, these provisions violate the Supremacy Clause, U.S. Const. art. VI, cl. 2, and are thus preempted.

105.   Pursuant to 18 U.S.C. § 2707(a)-(b), 42 U.S.C. § 1983, and this Court's equitable powers, Airbnb seeks injunctive relief against the City to prevent its enforcement of the Homesharing Surveillance Ordinance, which would conflict with and violate the SCA.

**COUNT IV – VIOLATION OF THE FIRST AMENDMENT TO THE U.S. CONSTITUTION AND CLAIM FOR INJUNCTIVE RELIEF, PURSUANT TO 42 U.S.C. § 1983 AND THE COURT'S EQUITABLE POWERS**

106.   Plaintiff incorporates all of the preceding paragraphs as if fully set forth herein.

107.   The First Amendment to the U.S. Constitution provides that "Congress shall make no law . . . abridging the freedom of speech."  The First Amendment applies to the States by virtue of the Fourteenth Amendment to the U.S. Constitution.

108.    The First Amendment prohibits the government from requiring persons to "voice ideas with which they disagree." *Janus* v. *Am. Fed'n of State, Cty., & Mun. Employees, Council 31*, 138 S. Ct. 2448, 2464 (2018).  This constitutional protection extends to commercial speech. *Int'l Dairy Foods Ass'n* v. *Amestoy*, 92 F.3d 67, 71 (2d Cir. 1996) ("The right not to speak inheres in political and commercial speech alike.")

109.    The Ordinance expressly requires Airbnb to communicate to users of Airbnb's homesharing platform a message that is prescribed by the City, namely, that (1) users must consent to the production of their sensitive personal data to City, (2) their use of the platform will constitute consent, and (3) their sensitive personal data will be turned over to a City agency that targets hosts for enforcement activity.   N.Y.C. Admin. Code § 26-2102(b).

110.    The Homesharing Surveillance Ordinance burdens Airbnb's protected First Amendment speech because it requires Airbnb to communicate a message to its users that Airbnb would not otherwise choose to communicate.  In fact, Airbnb vehemently disagrees with the statements that the Homesharing Surveillance Ordinance requires it to make.

111.    The Homesharing Surveillance Ordinance violates the First Amendment to the U.S. Constitution because it imposes an unjustified burden on Airbnb's First Amendment right not to communicate a message compelled by the City.

112.    Pursuant to 42 U.S.C. § 1983 and this Court's equitable powers, Airbnb seeks injunctive relief against the City to prevent its enforcement of the Homesharing Surveillance Ordinance, which would violate the First Amendment to the U.S. Constitution.

### COUNT V – DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201

113.    Plaintiff incorporates all of the preceding paragraphs as if fully set forth herein.

114.    This action presents an actual controversy between Airbnb and the City of New York concerning the validity of the Homesharing Surveillance Ordinance and the enforceability

of that Ordinance against Airbnb and other homesharing platforms.   Compliance with the Ordinance will cause immediate, irreparable harm to Airbnb's privacy and First Amendment rights, as well as the privacy and security of its users.

115.    Based on the foregoing allegations, Airbnb is entitled to a declaration, pursuant to 28 U.S.C. § 2201, that the Homesharing Surveillance Ordinance cannot be enforced against Airbnb because such enforcement would violate the Fourth Amendment to the U.S. Constitution, Article I, § 12 of the New York State Constitution, the SCA, 18 U.S.C. §§ 2701 *et seq.*, the Supremacy Clause of the U.S. Constitution, U.S. Const. art. VI, cl. 2, and the First Amendment to the U.S. Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

i.      Declare that the Homesharing Surveillance Ordinance violates the Fourth Amendment to the U.S. Constitution because it improperly authorizes the City to execute an administrative search without precompliance review;

ii.     Declare that the Homesharing Surveillance Ordinance violates Article I, § 12 of the New York State Constitution because it improperly authorizes the City to execute an administrative search without precompliance review;

iii.    Declare that the Homesharing Surveillance Ordinance violates the SCA, 18 U.S.C. §§ 2701 *et seq.* and the Supremacy Clause of the U.S. Constitution because it would compel Airbnb, an electronic communication service provider and remote computing service provider, to divulge information pertaining to subscribers or customers of such service to the City without a subpoena or any other form of legal process;

iv.      Declare that the Homesharing Surveillance Ordinance violates the First Amendment to the U.S. Constitution because it compels Airbnb to communicate a message that Airbnb would not otherwise choose to communicate;

v.      Preliminarily and permanently enjoin the City; its agencies, officers, agents, servants, employees, and attorneys; and all persons acting in concert or participation with them, from taking any actions to implement or enforce Chapter 21 of Title 26 of the New York City Administrative Code;

vi.      Award Plaintiff its reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

vii.      Award Plaintiff such other and further relief as the Court deems just and proper.

Dated: New York, New York
August 24, 2018

/s/ Roberta A. Kaplan
Roberta A. Kaplan
KAPLAN, HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York  10118
(212) 763-0883
rkaplan@kaplanhecker.com

Sharon L. Nelles
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
(212) 558-4000
nelless@sullcrom.com

*Attorneys for Plaintiff Airbnb, Inc.*