# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

AIRBNB, INC.,

                               Plaintiff,

           v.

THE CITY OF NEW YORK,

                         Defendant.

CIVIL ACTION NO. 18-cv-7712-PAE

---

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Roberta A. Kaplan
John C. Quinn
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
(212) 763-0883

Sharon L. Nelles
John G. McCarthy
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
(212) 558-4000

*Attorneys for Plaintiff Airbnb, Inc*

August 30, 2018

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND ..............................................................................................................4

    A.    Homesharing and Airbnb ....................................................................4

    B.    Hosts and Guests Provide Sensitive Personal Information to Airbnb .............................................................................................5

    C.    The Hotel Lobby Uses City Officials to Thwart Homesharing .............................6

    D.    The City Enacts the Homesharing Surveillance Ordinance in Violation of Fundamental Restraints on Government Action .................................9

LEGAL STANDARD......................................................................................................13

ARGUMENT ..................................................................................................................14

I.    AIRBNB IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS .................14

    A.    The Homesharing Surveillance Ordinance Violates the Fourth Amendment......................................................................................14

    B.    The Homesharing Surveillance Ordinance Violates the New York Constitution.....................................................................................20

    C.    The Homesharing Surveillance Ordinance Is Preempted by the Stored Communications Act .................................................................22

    D.    The Homesharing Surveillance Ordinance Violates the First Amendment......................................................................................28

II.    ONLINE HOMESHARING PLATFORMS AND HOSTS WILL BE IRREPARABLY HARMED ABSENT AN INJUNCTION ...............................................30

III.    THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST FAVOR AN INJUNCTION ......................................................................................33

CONCLUSION................................................................................................................35

# TABLE OF AUTHORITIES

*Page(s)*

CASES

*44 Liquormart, Inc.* v. *Rhode Island*,
  517 U.S. 484 (1996) ............................................................................................................ 30

*5 Borough Pawn, LLC* v. *City of New York*,
  640 F. Supp. 2d 268 (S.D.N.Y. 2009) ................................................................................. 21

*AIM Int'l Trading, L.L.C.* v. *Valcucine S.p.A.*,
  No. 02 Civ. 1263, 2002 WL 1285557 (S.D.N.Y. June 11, 2002) ....................................... 33

*Alaska Airlines, Inc.* v. *Brock*,
  480 U.S. 678 (1987) ............................................................................................................ 30

*Am. Freedom Def. Initiative* v. *Metro. Transp. Auth.*,
  880 F. Supp. 2d 456 (S.D.N.Y. 2012) ........................................................................... 13, 31

*Am. Trucking Ass'ns.* v. *City of Los Angeles*,
  559 F.3d 1046 (9th Cir. 2009) ............................................................................................. 34

*Amarin Pharma Inc.* v. *U.S. Food & Drug Admin.*,
  119 F. Supp. 3d 196 (S.D.N.Y. 2015) ................................................................................. 34

*Arizona* v. *Gant*,
  556 U.S. 332 (2009) ....................................................................................................... 14, 27

*Arizona* v. *United States*,
  567 U.S. 387 (2012) ............................................................................................................ 23

*Bank One, Utah* v. *Guttau*,
  190 F.3d 844 (8th Cir. 1999) ............................................................................................... 34

*Batalla Vidal* v. *Nielsen*,
  279 F. Supp. 3d 401 (E.D.N.Y. 2018) ................................................................................. 33

*Brenntag Int'l Chems., Inc.* v. *Bank of India*,
  175 F.3d 245 (2d Cir. 1999) ............................................................................................ 30-31

*Camara* v. *Mun. Court of City and Cty. of San Francisco*,
  387 U.S. 523 (1967) ............................................................................................................ 14

*Cent. Hudson Gas & Elec. Corp.* v. *Pub. Serv. Comm'n of N.Y.*,
  447 U.S. 557 (1980) ............................................................................................................ 30

*Chamber of Commerce of U.S.* v. *Edmondson*,
     594 F.3d 742 (10th Cir. 2010) ................................................................. 34

*Citigroup Global Mkts., Inc.* v. *VCG Special Opportunities Master Fund Ltd.*,
     598 F.3d 30 (2d Cir. 2010)................................................................... 13-14

*City of Los Angeles, Calif.* v. *Patel*,
     135 S. Ct. 2443 (2015) ............................................................... passim

*Collateral Loanbrokers Ass'n of New York, Inc.* v. *City of New York*,
     46 N.Y.S.3d 600 (1st Dep't 2017), *appeal dismissed*, 29 N.Y.3d 974 (2017) ................ 22

*Covino* v. *Patrissi*,
     967 F.2d 73 (2d Cir. 1992)........................................................................ 31

*Dodge* v. *County of Orange*,
     282 F. Supp. 2d 41 (S.D.N.Y. 2003)........................................................ 31

*Florida* v. *Jardines*,
     569 U.S. 1 (2013)............................................................... 16, 18-19

*Freedman* v. *Am. Online, Inc.*,
     303 F. Supp. 2d 121 (D. Conn. 2004) ....................................... 3, 25, 29

*Go-Bart Importing Co.* v. *United States*,
     282 U.S. 344 (1931) ........................................................................ 16

*Hale* v. *Henkel*,
     201 U.S. 43 (1906)............................................................................ 16

*Hardy* v. *Fischer*,
     701 F. Supp. 2d 614 (S.D.N.Y. 2010) .................................................. 31

*Homeaway.com, Inc.* v. *City of Portland*,
     No. 3:18-cv-00091, 2017 WL 2213154 (D. Or. May 11, 2017)...................... 22

*Homeaway.com, Inc.* v. *City of Santa Monica*,
     No. 2:16-cv-06641, 2018 WL 3013245 (C.D. Cal. June 14, 2018)............ 19-20

*In re Search Warrant Issued to Google, Inc.*,
     264 F. Supp. 3d 1268 (N.D. Ala. 2017) .............................................. 26

*In re United States for an Order Pursuant to 18 U.S.C. § 2705(b)*,
     289 F. Supp. 3d 201 (D.D.C. 2018) ............................................... 23, 24

*Int'l Dairy Foods Ass'n* v. *Amestoy*,
     92 F.3d 67 (2d Cir. 1996) ................................................................... 29

*Janus* v. *Am. Fed'n of State, Cty., & Mun. Employees, Council 31*,
    138 S. Ct. 2448 (2018) ................................................................................................ 29

*Jolly* v. *Coughlin*,
    76 F.3d 468 (2d Cir. 1996) ........................................................................................ 31

*Katz* v. *United States*,
    389 U.S. 347 (1967) ................................................................................................... 14

*Ligon* v. *City of New York*,
    925 F. Supp. 2d 478 (2013) ................................................................................. 31, 34

*Mamakos* v. *Town of Huntington*,
    715 F. App'x 77 (2d Cir. 2018) ................................................................................ 18

*Marshall* v. *Barlow's, Inc.*,
    436 U.S. 307 (1978) .............................................................................................. 14, 17

*Mitchell* v. *Cuomo*,
    748 F.2d 804 (2d Cir. 1984) ......................................................................... 3, 31, 33-34

*Morales* v. *Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) ................................................................................................. 3, 31

*Mullins* v. *City of N.Y.*,
    626 F.3d 47 (2d Cir. 2010) ........................................................................................ 31

*Murphy* v. *Nat'l Collegiate Athletic Ass'n*,
    138 S. Ct. 1461 (2018) .............................................................................................. 30

*Nat'l Inst. of Family & Life Advocates* v. *Becerra*,
    138 S. Ct. 2361 (2018) ........................................................................................... 3, 29

*Newland* v. *Sebelius*,
    881 F. Supp. 2d 1287 (D. Colo. 2012), *aff'd*, 542 F. App'x 706 (10th Cir. 2013) .......... 33

*Patel* v. *City of Los Angeles*,
    738 F.3d 1058 (9th Cir. 2013) .................................................................................. 16

*Payton* v. *New York*,
    445 U.S. 573 (1980) ................................................................................................... 19

*People* v. *Scott*,
    79 N.Y.2d 474 (1992) ...................................................................................... 2, 21, 22

*Planned Parenthood of Heartland* v. *Heineman*,
    724 F. Supp. 2d 1025 (D. Neb. 2010) ....................................................................... 33

*Riley* v. *Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
    487 U.S. 781 (1988) .................................................................... 29

*Rubin* v. *Coors Brewing Co.*,
    514 U.S. 476 (1995) .................................................................... 29

*Sams* v. *Yahoo! Inc.*,
    713 F.3d 1175 (9th Cir. 2013) ..................................................... 22

*Satellite Television of N.Y. Assocs.* v. *Finneran*,
    579 F. Supp. 1546 (S.D.N.Y. 1984) ........................................... 32

*See* v. *City of Seattle*,
    387 U.S. 541 (1967) .............................................................. 16, 17

*Silverman* v. *United States*,
    365 U.S. 505 (1961) ................................................................ 18-19

*Silverthorne Lumber Co.* v. *United States*,
    251 U.S. 385 (1920) .................................................................... 16

*Sokolov* v. *Vill. of Freeport*,
    52 N.Y.2d 341 (1981) .................................................................. 18

*Soldal* v. *Cook County*,
    506 U.S. 56 (1992) ...................................................................... 14

*Sorrell* v. *IMS Health Inc.*,
    564 U.S. 552 (2011) .................................................................... 29

*Sterling Drug, Inc.* v. *Bayer AG*,
    14 F.3d 733 (2d Cir. 1994) .......................................................... 33

*Stuhlbarg Int'l Sales Co.* v. *John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001) ....................................................... 32

*Telecommc'ns Reg. Bd. of P.R.* v. *CTIA-Wireless Ass'n*,
    752 F.3d 60 (1st Cir. 2014) ............................................. 23, 27, 29

*Tom Doherty Assocs.* v. *Saban Entm't, Inc.*,
    60 F.3d 27 (2d Cir. 1995) ............................................................ 32

*United States* v. *Caronia*,
    703 F.3d 149 (2d Cir. 2012) ........................................................ 30

*United States* v. *Chicago, M., St. P. & P.R. Co.*,
    282 U.S. 311 (1931) .................................................................... 18

*United States* v. *Jones*,
565 U.S. 400 (2012) ................................................................ 14

*Virginia State Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976) ................................................................ 29

*Winter* v. *Natural Res. Def Council, Inc.*,
555 U.S. 7 (2008) ............................................................. 13, 30

**CONSTITUTIONAL PROVISIONS, STATUTES & LEGISLATIVE MATERIALS**

U.S. Const. Art. VI ................................................................. 23

U.S. Const. First Amendment ........................................... passim

U.S. Const. Fourth Amendment ........................................ passim

18 U.S.C. § 2701 .............................................................. passim

N.Y. Const. Art. I, § 12 ................................ 2, 20, 21, 22, 31

N.Y. Mult. Dwell. Law §§ 4(6), 4(8) ................................. 30

S. Rep. No. 99-541 (1986) ..................................................... 26

**MUNICIPAL CODES & ORDINANCES**

N.Y.C. Admin. Code § 3-216 ................................................ 20

N.Y.C. Admin. Code § 16-120.1 .......................................... 20

N.Y.C. Admin. Code § 22-506 ............................................. 20

N.Y.C. Admin. Code § 26-2101-5 ................................... passim

N.Y.C. Admin. Code § 27-232 ............................................. 30

N.Y.C. Admin. Code, Tit. 28, Ch. 7, § Build. Code 310.2 ......... 30

Local Law 2018/146, § 2 ................................. 1, 10, 12, 33

Santa Monica Mun. Code § 6.20.050(b) ............................... 19

Plaintiff Airbnb, Inc. ("Airbnb") respectfully submits this memorandum of law in support of its Motion for a Preliminary Injunction.[1]

## PRELIMINARY STATEMENT

In an extraordinary act of government overreach, the City of New York has enacted an unprecedented surveillance ordinance that violates the privacy and free speech rights of homesharing platforms as well as the privacy and security of New Yorkers who use them. Local Law 2018/146, N.Y City Admin. Code § 26-2101-5 (the "Homesharing Surveillance Ordinance" or the "Ordinance") would require homesharing platforms, on a monthly basis, to turn over personal information about their hosts and how they are using their homes, together with the platforms' own commercially sensitive information, to a special City enforcement agency known to be working with the hotel lobby against homesharing. No probable cause, notice, or legal review is contemplated, and no meaningful restrictions on the use or publication of this commercially sensitive, private data are provided. The Ordinance also requires homesharing platforms to communicate to their hosts that the mere use of such a platform will constitute "consent" to this compelled disclosure.

The City's extraordinary intrusion into its citizens' private affairs, as well as the urgency of the threatened harm, warrant this Court's immediate intervention. If allowed to take effect, the Ordinance will cause irreparable harm to homesharing platforms by violating their constitutional rights and forcing them to choose between either risking ruinous penalties or being in the untenable position of having to: (i) undertake the significant costs of compliance,

---

[1] In support of this memorandum, Airbnb submits the Declaration of David Countryman ("Countryman Decl."), together with certain exhibits that are referred to herein as "DC Ex._," and the Declaration of John C. Quinn ("Quinn Decl."), which collects other supporting materials that are referred to herein as "JQ Ex._."

(ii) disclose their own commercially sensitive information, and (iii) be the compelled sponsor of the government's threatening message. Even before it goes into effect, the Ordinance threatens to do irreversible commercial harm to homesharing platforms by intimidating hosts who are concerned about their own privacy and government surveillance into abandoning homesharing.

A preliminary injunction is warranted under the U.S. Constitution, New York Constitution, and federal law, all of which provide powerful safeguards against precisely this sort of government overreach:

*First*, Airbnb is likely to succeed in demonstrating that the Homesharing Surveillance Ordinance is unlawful. The Ordinance violates the Fourth Amendment to the U.S. Constitution, which prohibits the City from creating an administrative search regime without affording affected businesses an opportunity "to obtain precompliance review before a neutral decisionmaker." *City of Los Angeles, Calif.* v. *Patel*, 135 S. Ct. 2443, 2452 (2015) (holding that hotels could not be compelled to turn over information about reservations and guests to law enforcement agencies without precompliance review). Indeed, the privacy interests at stake here are even more significant than those underlying the decision in *Patel*, as homesharing is fundamentally about how people use their homes. For similar reasons, the Ordinance violates Article I, Section 12 of the New York Constitution, which confers even broader privacy protections than the Fourth Amendment and is less tolerant of searches conducted without legal process. *People* v. *Scott*, 79 N.Y.2d 474, 498 (1992). In addition, the Ordinance is preempted in its entirety by the Stored Communications Act, 18 U.S.C. § 2701 *et seq.* (the "SCA"), which forbids government agencies from compelling providers of electronic communication services and remote computing services, such as Airbnb, to disclose user information without appropriate legal process or user consent. The City is not entitled to manufacture "consent" by mandating that

Airbnb obtain blanket advance "consent" from all hosts as a condition of using its platform: "[T]he burden is on the governmental entity to obtain consent." *Freedman* v. *Am. Online, Inc.*, 303 F. Supp. 2d 121, 129 (D. Conn. 2004). Finally, the Ordinance violates the First Amendment in that it "compel[s] [Airbnb] to speak a particular message" that it would never choose to speak, *i.e.*, the City-mandated statements that users of Airbnb's homesharing platform must consent to the production of their sensitive personal data and that mere use of the platform will constitute "consent" to that disclosure. *See Nat'l Inst. of Family & Life Advocates* v. *Becerra*, 138 S. Ct. 2361, 2371 (2018).

*Second*, the Homesharing Surveillance Ordinance will necessarily cause Airbnb irreparable harm in the absence of a preliminary injunction because "an alleged deprivation of a constitutional right is involved." *See Mitchell* v. *Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984). The irreparable harm standard is also satisfied here because the Ordinance would require Airbnb to face a Hobson's choice: either risk significant liability ($1,500 or more *per listing*) by refusing to comply with the Ordinance or immediately undertake expensive steps to prepare for compliance with a requirement that is clearly preempted by federal law (and which threatens to gut its business through intimidation). *See Morales* v. *Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). Even before it goes into effect, the Ordinance threatens to cause significant and potentially irreversible harm to Airbnb's business, because—particularly in light of its failure to distinguish between lawful and unlawful operators—the Ordinance appears designed to chill homesharing throughout the City altogether.

*Finally*, the balance of the equities and the public interest support a preliminary injunction here. Whereas Airbnb risks the loss of its constitutional rights, as well as irreversible commercial damage, the City will face no harm from maintenance of the *status quo ante*. In

investigating potential violations of law, the City can—and does—serve subpoenas and other legal process on Airbnb that are sufficient to meet the City's investigative needs. By any measure, the public interest is poorly served by requiring Airbnb to provide a trove of private data about its hosts on a monthly basis, thereby violating fundamental constitutional and legal rights.

Accordingly, this Court should preliminarily enjoin the Ordinance.

## BACKGROUND

### A.     Homesharing and Airbnb

"Homesharing"—the renting of one's own home to travelers—is not a new concept, but the Internet has made it far easier and more accessible for people around the globe. Homesharing websites and Internet applications provide platforms that facilitate the matching of travelers looking for a place to stay (guests) with local people looking to share their living spaces (hosts), and those platforms then provides the means for the hosts and guests to enter into an agreement, securely communicate, and pay for the stay.

Founded in 2008, Airbnb is a homesharing platform with the mission of creating a world where people can connect to local cultures and communities and have more unique travel experiences. (Countryman Decl. ¶ 2.) Airbnb's platform is used by millions of hosts and guests throughout the world. New York City is one of its largest markets. (*See generally* DC Ex. H.). In 2016, more than 700,000 short-term rental bookings were made through Airbnb's platform in New York City. (*Id*. at 32.) Publicly available data shows that Airbnb has a significantly positive impact on local communities, including those within New York City, with bookings in 2016 generating roughly $2.8 billion in economic activity and supporting approximately 30,000 jobs. (*Id*. at 10.) More than 90% of hosts share a property that is their primary residence. (DC Ex. J at 7.) And most hosts share space occasionally—the median nights booked per listing between August 2017 and August 2018 was 61, or just over one night per week. (*Id*. at 1, 3.)

Thus, at its core, homesharing involves people's use of their own private property.

**B.** **Hosts and Guests Provide Sensitive Personal Information to Airbnb**

Before anyone can use Airbnb's platform—as a host or guest—the user must first become a member of Airbnb. To sign up on the Airbnb website, a user clicks the "Sign up" link at the top right of the homepage, www.airbnb.com. Users can also sign up using Airbnb's mobile app. In signing up, the user submits identifying information (or enters his or her Facebook or Google credentials). After clicking "Sign up," the user is prompted to accept Airbnb's Community Commitment, Terms of Service, Payments Terms of Service, Privacy Policy, and Nondiscrimination Policy, all of which are mandatory to use the platform. (*See* Countryman Decl. ¶¶ 4-5.)

To become an Airbnb "host," a user creates a listing for his or her accommodation on the platform, and provides descriptions, images and videos, prices, and dates of availability for the space. (*See* Countryman Decl. ¶ 11; DC Ex. B § 3.3.) A typical Airbnb listing shows the general location and a basic description of the property, and the host's first name. To protect the privacy and security of hosts, listings do not include a host's full name, email address, or telephone number, nor do they disclose the precise listing address. (Countryman Decl. ¶ 12; DC Ex. B § 3.3; DC Ex. D at 1.) All of that information is maintained in confidence by Airbnb. (Countryman Decl. ¶ 11.)[2]

Once guests have identified accommodations in which they are interested, guests and hosts may securely and privately message each other through the platform. (Countryman Decl. ¶ 12; DC Ex. F at 1.) If a guest and a host reach an agreement, the platform then (and only then)

---

[2] Similarly, while guests can search the platform by location, dates, or other criteria, the platform does not disclose full host names or listing addresses in search results. (Countryman Decl. ¶ 11; DC Ex. D at 1; DC Ex. E at 1.)

securely discloses the listing address to the guest.  (Countryman Decl. ¶ 12; DC Ex. D at 1.)  The platform also provides a secure payment-processing service through which the guest pays the host electronically.  (Countryman Decl. ¶ 12; DC Ex. B § 3.6; DC Ex. G at 1.)  Airbnb also provides electronic storage on its platform for communications between users, as well as for images and videos.  (Countryman Decl. ¶ 12.)

Airbnb hosts and guests have a reasonable expectation of privacy in the personal information they share with Airbnb.  Pursuant to its Privacy Policy, Airbnb holds users' personal information in a secure manner and uses it for purposes of facilitating Airbnb transactions, such as to provide customer service, enable communications between users, and monitor for fraud.  (*See* DC Ex. B § 2.)  Indeed, Airbnb's Privacy Policy explicitly states that "[w]e use, store, and process information, including personal information, about you to provide, understand, improve, and develop the Airbnb Platform, create and maintain a trusted and safer environment and comply with our legal obligations."  (*Id*.)  Those "legal obligations" have never included anything like the unlawful mass disclosure of private information required by the Homesharing Surveillance Ordinance.  Rather, Airbnb discloses non-public user information only in response to valid legal requests, with limited exceptions.  (*Id*. § 3.5.)  As outlined in Airbnb's publicly-available policy for responding to law enforcement requests, Airbnb "has a policy of using commercially reasonable efforts to notify users when it receives legal process from a third party requesting user data."  (DC Ex. C at 2.)  Pursuant to these policies, Airbnb provides information in response to legal process, including from the Office of Special Enforcement, after providing notice to users whenever possible.  (Countryman Decl. ¶ 9.)

### C.    The Hotel Lobby Uses City Officials to Thwart Homesharing

Why would the City enact an unprecedented and invasive disclosure ordinance notwithstanding the policy and practice of obtaining information through proper legal process?

The Homesharing Surveillance Ordinance is the product of a targeted political campaign by the hotel lobby to injure Airbnb and other homesharing platforms.

The traditional hotel industry in New York City views the popularity of homesharing as a threat because it provides travelers a unique and often less expensive alternative to the City's high-priced hotels. This limits the ability of hotels to price-gouge customers at peak times and in areas of high concentration, as publicly admitted by hotel executives. For example, in 2015, Jon Bortz, chief executive of Pebblebrook Hotel Trust, which at the time owned Embassy Suites, Doubletree, and other hotels, said that Airbnb limited the company's "ability to price at what maybe the customer would describe as sort of gouging rates." (JQ Ex. A at 3.) As a recent *Forbes* article explained, "Airbnb is revolutionizing the lodging market by keeping hotel rates in check and making additional rooms available in the country's hottest travel spots during peak periods when hotel rooms often sell out and rates skyrocket . . . . That's bad news for hotels . . . [a]nd it's good news for travelers." (JQ Ex. B at 2.)

The hotel industry has pursued a "multipronged, national campaign approach at the local, state and federal level" to thwart Airbnb, according to board minutes of the American Hotel and Lodging Association, a trade group that includes Marriott International, Hilton Worldwide and Hyatt Hotels. (JQ Ex. C at 1.) These board minutes make clear that the hotel industry uses a narrative about commercial operators' supposed use of homesharing platforms for the proffering of "illegal hotels" as a pretext for a more comprehensive attack on homesharing: "Objective: Build on the success of 2016 efforts to ensure comprehensive legislation in key markets around the country and create a receptive environment to launch a wave of strong bills at the state level while advancing a national narrative . . . on reining in commercial operators . . . ." (JQ Ex. D at 3.)

Notably, in New York City alone, the hotel lobby has spent approximately $2 million to run attack ads targeted at homesharing just in the past two years,[3] and spent another approximately $860,000 in contributions to, and independent expenditures in support of, members of the City Council in the 2013 and 2017 election cycles.[4]  As part of its "multi-pronged strategy," the hotel lobby also has focused its attention on the City's Office of Special Enforcement.

Created in 2006, the Office of Special Enforcement was intended to be an expansion of a decades-old effort to improve public safety and quality of life in midtown Manhattan through the Office of Midtown Enforcement.  (JQ Ex. J (N.Y. City Executive Order No. 96, Nov. 20, 2006).)  In its early years, the Office of Special Enforcement cracked down on counterfeit consumer products like handbags, went after video piracy, and enforced the City's noise code.  (*See*, *e.g.*, JCQ Exs. K-M.)  The mission, budget, and practices of the Office of Special Enforcement, however, changed dramatically as a result of the hotel industry's efforts.  Shortly after the 2013 elections, the Office of Special Enforcement began to shift toward an almost exclusive focus on homesharing.  (*See* JQ Ex. N at 3.)[5]

In 2014, the City purchased 24 "Gotham" server cores from data-crunching company Palantir Technologies, Inc. ("Palantir")—at a cost of nearly one million dollars.  (JQ Ex. O at 2.)  The Gotham server cores contain highly sophisticated technology that aggregates and

---

[3] JQ Ex. E at 1 (lobby spending "more than $1 million" running attack ads); Ex. F at 2 (describing a ten-day "roughly half-million dollar ad buy" in August 2017); Ex. G at 1 (describing a "mid-six figure" advertising campaign).

[4] JQ Ex. H at 2-3 (listing hotel industry contributions to City Council members totaling $460,217); JQ Ex. I (Hotel Workers for Stronger Communities disclosed expenditures totaling $395,498).

[5] Airbnb takes unilateral action to remove illegal operators from the platform pursuant to its Community Compact and "One Host, One Home" policies.  *See* Countryman Decl. ¶¶ 16-19; DC Exs. J-L (outlining policies and noting that between November 1, 2015 and June 1, 2018, Airbnb removed more than 5,000 listings in New York City from hosts with multiple listings).

synthesizes data from a variety of sources into a common format and a single database.  (JQ Ex. P at 3-4.)  The City also acquired licenses for a Palantir mobile technology that allows users to access the master Gotham database from a smartphone.  That technology was quickly rolled out to Office of Special Enforcement agents.  In the words of one press report, this mobile technology "connect[s] them to everything the City knows about every place within it."  (JQ Ex. O at 2.)  Another press report explained that Office of Special Enforcement officials use this technology to "catch Airbnb hosts."  (JQ Ex. Q at 2.)

In June 2015, Elan Parra, director of the Office of Special Enforcement, left the agency and went to work for Lemire LLC, a consulting firm that works for the hotel lobby.  (JQ Ex. R at 3; JQ Ex. S at 1; JQ Ex. T at 4.)  Parra maintained close ties with Office of Special Enforcement personnel and began coordinating with them to target Airbnb hosts.  On August 10, 2015 an Office of Special Enforcement official forwarded an invitation to an Airbnb Happy Hour to Parra with the subject line, "*Great U/C [undercover] Opportunity*."  The official suggested to Parra that they could "*infiltrate, get some insight and then vacate the party*."  (JQ Ex. U at 1.)

By 2017, the Office of Special Enforcement had effectively outsourced a substantial portion of its investigatory work to private hotel groups, including Lemire.  The agency was, at the very least, relying on "dossiers" that Lemire investigators provided to the Office of Special Enforcement "wrapped in a bow."  (JQ Ex. T at 4.)  And the agency reported in mid-2017 that it was spending 95% of its time on enforcement efforts related to homesharing.  (*Id*.)

D.    **The City Enacts the Homesharing Surveillance Ordinance in Violation of Fundamental Restraints on Government Action**

The Homesharing Surveillance Ordinance requires Airbnb to hand over, directly to the Office of Special Enforcement, vast amounts of private data about its hosts as well as sensitive commercial information.  The Ordinance was passed by the City Council on July 18, 2018 and

signed into law by Mayor de Blasio on August 6, 2018. (JQ Ex. V.) It is scheduled to go into effect on February 2, 2019. *See* Local Law 2018/146, § 2.

Under the Ordinance, online homesharing platforms are required to "[s]ubmit to the [Office of Special Enforcement] . . . a report of transactions . . . in a time, manner and form established by such agency . . . on a monthly basis." N.Y. City Admin. Code § 26-2102(a). These monthly transaction reports must include, for every short-term rental through the platform:

(1) The physical address of the short-term rental associated with such transaction, including the street name, street number, apartment or unit number, borough or county, and zip code;

(2) The full legal name, physical address, phone number and email address of the host of such short-term rental and the uniform resource locator (URL) and the individualized name and number of such host on such booking service's platform;

(3) The individualized name and number and the URL of such advertisement or listing;

(4) A statement as to whether such short-term rental transaction involved (i) short-term rental of the entirety of a dwelling unit or housing accommodations in a building or (ii) short-term rental of part of such unit or housing accommodations;

(5) The total number of days that the dwelling unit, part thereof or housing accommodations in a building were rented as a short-term rental through such booking service's platform;

(6) The total amount of fees received by such booking service for such short-term rental; and

(7) If such booking service collects rent for short-term rentals on behalf of such host, (i) the total amount of such rent received by such booking service and transmitted to such host and (ii) the account name and consistently anonymized identifier for the account number for the account used by such host to receive payments from such booking service or, if such booking service provides an explanation why such anonymized identifiers are unavailable, the account name and account number for such account.

*Id.*

If allowed to go into effect, these provisions would require Airbnb to turn over personal information that is not made publicly available through its platform, including the full legal names, home addresses, telephone numbers, and email addresses of hosts, as well as detailed information about how they use their private property, whether and when they invite others into their homes, and, if the platform "collects rent," sensitive bank account information. The Ordinance requires the disclosure of data about all hosts, regardless of whether the City believes or even suspects they are engaged in unlawful behavior. When taken together, this information would enable the City to identify, contact, target, and monitor vast numbers of *legal* hosts.

The Homesharing Surveillance Ordinance also would require Airbnb to turn over its own non-public and competitively sensitive information, including detailed breakdowns of its revenues, and extensive information about the listings on its platform. And it would require Airbnb to turn this data over to the Office of Special Enforcement, the very agency that has, in close coordination with the hotel lobby, made it its mission to attack Airbnb and its hosts.

Significantly, the Homesharing Surveillance Ordinance does not include even basic safeguards relating to the collection, retention, or use of this data. For example, nothing in the Ordinance would prevent the Office of Special Enforcement from uploading the information directly into Palantir's Gotham database to make it available to every agency and official in the City, including law enforcement. Further, although the Ordinance provides that information included in the transaction reports "shall be available for public review only to the extent required by federal, state and local law," *see* N.Y. City Admin. Code § 26-2105, nothing in the Ordinance prevents the Office of Special Enforcement from turning the data over to any member of the public (including the hotel lobby) who files a request under New York's Freedom of Information Law.

And, in an Orwellian twist, the Homesharing Surveillance Ordinance requires Airbnb to obtain "lawful consent to provide the information . . . to [the Office of Special Enforcement]" from every host on its platform. *Id*. § 26-2102(b). Specifically, Airbnb must advise all hosts that the mere act of using its platform will *per se* "constitute consent" to the disclosure of their sensitive personal and financial information to the Office of Special Enforcement. *Id*. Because there is no mechanism for a host to opt out, even if a host does not actually consent, Airbnb will still be required to disclose his or her personal information. *See id*.

Pursuant to the Ordinance, a homesharing platform like Airbnb that fails to submit a transaction report with the required information is subject to a civil penalty, "to be assessed once per reporting period for each set of records corresponding to a listing which is missing, incomplete or inaccurate," of "not more than the greater of $1,500 or the total fees collected during the preceding year by the booking service for transactions related to the listing." *Id*. § 26-2104. Given the large number of listings Airbnb has in New York City, as discussed above, those penalties could mount to very substantial sums of money very quickly.

Prior to the Ordinance's February 2, 2019 effective date, the Office of Special Enforcement is authorized to "take such measures as are necessary for its implementation, including the promulgation of rules." *See* Local Law 2018/146, § 2. In addition, prior to the effective date, Airbnb will be required to take steps to prepare for compliance, at significant cost to the company, including: (i) notifying tens of thousands of hosts of the City's new regulatory regime and seeking their "consent" to disclose their personal information; (ii) creating new processes and controls and revising its systems to ensure that it only lists properties where hosts have consented to disclosure of their personal information; and (iii) devising a system to collect and confirm the pertinent data and produce the required monthly transactional reports to the Office

of Special Enforcement.  (*See* DC Decl. ¶ 25.)  In the interim, Airbnb will suffer immediate and irreparable commercial harm, as hosts throughout the City are informed that if they continue to use the Airbnb platform, their personal data will be turned over to the Office of Special Enforcement.  Many may well decide to abandon homesharing as a result.

The Homesharing Surveillance Ordinance is unprecedented among City laws in the level, frequency, and manner of disclosure of third-party information that it compels.  In no other industry or context does the New York City Administrative Code (the "Code") require companies to disclose such detailed and sensitive information about third parties on such a frequent basis.  In particular, no provision of the Code requires hotels to disclose the names of its patrons or details about their stays.  Moreover, Airbnb is not aware of any other municipality in the United States that requires disclosure of information by online homesharing platforms in the nature or manner of the disclosure mandated by the Homesharing Surveillance Ordinance.  (*See* Compl. ¶ 83.)  In short, neither New York City, nor any other city, nor any state, nor the federal government, has ever tried anything like this ever before.

## LEGAL STANDARD

Courts apply the following familiar four-factor test when deciding whether to grant a preliminary injunction:  (1) the likelihood of the movant's success on the merits; (2) the risk of irreparable harm absent equitable relief; (3) the balance of the equities; and (4) the public interest. *See Winter* v. *Natural Res. Def Council, Inc.*, 555 U.S. 7, 20 (2008); *Am. Freedom Def. Initiative* v. *Metro. Transp. Auth.*, 880 F. Supp. 2d 456, 465 (S.D.N.Y. 2012) (Engelmayer, J.) ("*AFDI*") (granting preliminary injunction against MTA).  Although likelihood of success on the merits is the first factor, a movant need not show it is likely to succeed on the merits if it can demonstrate the existence of "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary

relief." *Citigroup Global Mkts., Inc.* v. *VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35, 37-38 (2d Cir. 2010) (internal quotation marks omitted).

## ARGUMENT

## I.    AIRBNB IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS

### A.    The Homesharing Surveillance Ordinance Violates the Fourth Amendment

Motivated by the practice of King George's abusive use of "writs of assistance" to enter American colonists' property or homes without any notice or any reason, the Fourth Amendment exists "to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara* v. *Mun. Court of City and Cty. of San Francisco*, 387 U.S. 523, 528 (1967). Its protection extends to all records that property law has historically shielded from unwelcome intrusion. *See United States* v. *Jones*, 565 U.S. 400, 405-06 (2012). In addition, it covers all information that a person "seeks to preserve . . . as private," so long as her expectation of privacy is "reasonable." *Katz* v. *United States*, 389 U.S. 347, 351 (1967); *accord Soldal* v. *Cook County,* 506 U.S. 56, 64 (1992).

Where the Fourth Amendment applies, government officials may not demand access to information unless they follow certain procedures. Most of the time, they must obtain a warrant. *See Arizona* v. *Gant*, 556 U.S. 332, 338 (2009). That is true for information taken from "commercial premises as well as . . . homes." *Marshall* v. *Barlow's, Inc.*, 436 U.S. 307, 312 (1978). There are narrow, carefully-bounded exceptions to this rule. For instance, as the Supreme Court has explained, the warrant requirement does not apply where the government acts pursuant to "special needs," and where the "primary purpose of the searches is distinguishable from the general interest in crime control." *Patel*, 135 S. Ct. at 2452 (internal quotation marks and alterations omitted). In such cases—which involve "administrative searches"—the government need not obtain a warrant, but it must provide "the subject of [its] search" with "an opportunity to

obtain precompliance review before a neutral decisionmaker." *Id.* (citations omitted). Thus, when an administrative agency seeks to review a company's records, it must do so pursuant to a scheme that allows the company to seek precompliance review. This requirement minimizes the risk that searches "will exceed statutory limits, or be used as a pretext to harass . . . ." *Id.*

The Supreme Court's recent decision in *Patel* demonstrates exactly how the Fourth Amendment applies to governmental searches in the context of this case. There, the Supreme Court assessed a Los Angeles ordinance that "require[d] hotel operators to record information about their guests," including "the guest's name and address; the number of people in each guest's party; . . . the guest's date and time of arrival and scheduled departure date; . . . [and] the rate charged." *Id.* at 2447-48. The Los Angeles ordinance also required hotels "to make their registries available to the police on demand." *Id.* In response to the hotel industry's challenge to this ordinance, the Supreme Court first concluded that the Fourth Amendment protected the hotels' right to privacy in such information. *See id.* at 2451-52. Then, construing the contemplated inspections as administrative searches, it held that the ordinance was "facially unconstitutional because it penalizes [hotel operators] for declining to turn over their records without affording them any opportunity for precompliance review." *Id.* at 2447; *see also id.* at 2451-54. The Court noted that it had "never attempted to prescribe the exact form an opportunity for precompliance review must take," but noted that "the City does not even attempt to argue that [the ordinance] affords hotel operators any opportunity whatsoever." *Id.* at 2452. For this reason, the ordinance was "facially invalid." *Id.*

So too here. Like the ordinance struck down in *Patel*, the Homesharing Surveillance Ordinance is facially invalid under the Fourth Amendment because it burdens

Airbnb's Fourth Amendment rights by requiring it to surrender protected information without any opportunity for precompliance review.

Airbnb indisputably has a protectable interest in the records covered by the Homesharing Surveillance Ordinance. Where the government compels a business to turn over its "papers," the very text of the Fourth Amendment is implicated. *See Patel* v. *City of Los Angeles*, 738 F.3d 1058, 1061-62 (9th Cir. 2013) (en banc), *aff'd sub nom. City of Los Angeles* v. *Patel*, 135 S. Ct. 2443, 2452 (2015); *see also Go-Bart Importing Co.* v. *United States*, 282 U.S. 344, 349-50 (1931); *Silverthorne Lumber Co.* v. *United States*, 251 U.S. 385, 391 (1920); *Hale* v. *Henkel*, 201 U.S. 43, 76-77 (1906). Indeed, a company's common law possessory interest in its own records would have "little practical value" if the government could commandeer them at will. *See Florida* v. *Jardines*, 569 U.S. 1, 6 (2013). This property-based understanding, in turn, confirms the reasonableness of Airbnb's expectation of privacy in its own data. *See id.* at 12-14 (Kagan, J., concurring). As the Ninth Circuit explained in *Patel*, "businesses do not ordinarily disclose, and are not expected to disclose, the kind of commercially sensitive information contained in the records—*e.g.*, customer lists, pricing practices, and occupancy rates." *Patel*, 738 F.3d at 1061-62. Likewise, Airbnb expends substantial effort creating and compiling the data covered by the Ordinance, and takes significant steps to preserve the privacy of that sensitive information. (See Countryman Decl. ¶¶ 7-9, 11-12, 22.) Moreover, Airbnb's guests and hosts reasonably rely on Airbnb to protect their privacy and security. Airbnb is therefore entitled to expect that the government cannot inspect its records capriciously. *E.g.*, *See* v. *City of Seattle*, 387 U.S. 541, 544 (1967); *Patel*, 738 F.3d at 1061-62.

Because the Homesharing Surveillance Ordinance burdens Airbnb's rights under the Fourth Amendment, the Supreme Court's administrative search cases supply the appropriate

framework for review.  Just like the ordinance at issue in *Patel*, the Ordinance authorizes the ongoing seizure of sensitive commercial and personal information from a lawful business that has a constitutional right to keep that information private.  And just like the Los Angeles ordinance, the Ordinance purportedly exists for a regulatory purpose that is not connected to conducting criminal investigations.  *See Patel*, 135 S. Ct. at 2452 & n.2; *see also City of Seattle*, 387 U.S. at 534-35.  Those facts require application of the administrative search doctrine.[6]

Applying that doctrine, the Homesharing Surveillance Ordinance facially violates the Fourth Amendment, because it does not afford any opportunity for precompliance review before a neutral decisionmaker.  As the Supreme Court has repeatedly explained, precompliance review is critical to any lawful administrative search ordinance.  *See Patel*, 135 S. Ct. at 2452; *Barlow's*, 436 U.S. at 323; *City of Seattle*, 387 U.S. at 545.  Requiring the government to afford targets an opportunity to challenge abusive, arbitrary, or improper demands for information vindicates important constitutional principles.  *See Patel*, 135 S. Ct. at 2452-53.  That is especially true in cases like this one, where there is a demonstrated risk that City officials will in fact act at the behest of hostile market competitors, rather than in the public interest.  Because the Ordinance

---

[6] Although searches of entities in a "closely regulated" industry are treated differently, that exception has no application here.  *See Patel*, 135 S. Ct. at 2454.  The Supreme Court has emphasized that only a handful of industries "have such a history of government oversight" that participants have "no reasonable expectation of privacy" in their books and records.  *Barlow's*, 436 U.S. at 313.  Indeed, the *Patel* Court noted that only four industries—alcohol, firearms, mining, and automobile junkyards—have ever been deemed "closely regulated," and further held that the hotel industry is not "closely regulated."  *See Patel*, 135 S. Ct. at 2454-55.  It would be odd to treat homesharing platforms any differently, especially as there is no reason to believe that homesharing platforms pose a "clear and significant risk to the public welfare" or are "intrinsically dangerous."  *Patel*, 135 S. Ct. at 2454 & 2555 n.5 (describing criteria for concluding that an industry is "closely regulated").  Of course, passage of the Homesharing Surveillance Ordinance cannot (and does not) *itself* transform homesharing into a closely regulated industry.  *See Patel*, 135 S. Ct. at 2455.

requires broad administrative searches without satisfying the most basic requirement for any such search, it cannot withstand scrutiny under the Fourth Amendment.[7]

The Homesharing Surveillance Ordinance is not saved by the provision that compels Airbnb to condition the use of its platform on a host's "consent" to the production of this sensitive personal and commercial data. As in *Patel*, the Homesharing Surveillance Ordinance violates Airbnb's Fourth Amendment rights in data about its hosts—and it is undisputed that Airbnb has not consented to anything. Even leaving aside the important distinction between Airbnb's Fourth Amendment rights and the privacy rights of the hosts themselves, as a general rule, the government cannot condition the use of private property on a compelled waiver of Fourth Amendment rights. *See Sokolov* v. *Vill. of Freeport*, 52 N.Y.2d 341, 346 (1981) (village cannot "condition an owner's ability to engage his property in the business of residential rental upon his forced consent to forego certain rights guaranteed to him under the Constitution"); *see also United States* v. *Chicago, M., St. P. & P.R. Co.*, 282 U.S. 311, 328-29 (1931); *Mamakos* v. *Town of Huntington*, 715 F. App'x 77, 79 (2d Cir. 2018).

In fact, the Ordinance is arguably even more offensive to Fourth Amendment values than the ordinance struck down in *Patel* because the Ordinance requires the disclosure of information about how citizens are using their homes. As the Supreme Court has recognized, "when it comes to the Fourth Amendment, the home is first among equals. At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Jardines*, 569 U.S. at 6 (quoting *Silverman* v. *United*

---

[7] The fact that the Ordinance requires affirmative, wholesale production of transaction records on a continuing basis, rather than requiring such records to be made available for inspection upon request, is a distinction without a difference. Permitting the government to avoid the precompliance review requirement by demanding monthly delivery of a company's most sensitive data would fly in the face of *Patel* and would create alarming incentives for City officials.

*States*, 365 U.S. 505, 511 (1961)).  Indeed, "the overriding respect for the sanctity of the home . . . has been embedded in our traditions since the origins of the Republic."  *Payton* v. *New York*, 445 U.S. 573, 601 (1980).  The Homesharing Surveillance Ordinance runs roughshod over these fundamental constitutional principles.[8]

The conclusion that the Homesharing Surveillance Ordinance violates the Fourth Amendment is supported by the recent decision in *Homeaway.com, Inc.* v. *City of Santa Monica*, No. 2:16-cv-06641, 2018 WL 3013245 (C.D. Cal. June 14, 2018).  There, homesharing platforms (including Airbnb) challenged a Santa Monica ordinance that includes disclosure requirements similar to (but not as intrusive as) the Homesharing Surveillance Ordinance:  "Subject to applicable laws, hosting platforms shall disclose to the City on a regular basis each homesharing and vacation rental located in the City, the names of the persons responsible for each such listing, the address of each such listing, the length of stay for each such listing and the price paid for each stay."  Santa Monica Mun. Code ("SMMC") § 6.20.050(b).  The plaintiffs' challenge included a Fourth Amendment claim based on the Supreme Court's ruling in *Patel*.  *See Homeaway.com*, 2018 WL 3013245, at *7-8.  The court there did not hesitate in applying the analytical framework from *Patel*, and concluded that the statute permitted judicial review of any requests for information because the court "interpret[ed]" the ordinance to "include the subpoena and review provisions" elsewhere

---

[8] The Office of Special Enforcement has claimed since the filing of this action that the Ordinance "provides the city with the critical data it needs to preserve our housing stock, keep visitors safe, and ensure residents feel secure in their homes and neighborhoods."  (*See* JQ Ex. W at 3.)  These assertions do not withstand even cursory scrutiny.  The Ordinance makes no distinctions between illegal operators who take housing stock off the market and everyday New Yorkers who rent out their own homes or spare rooms, does not seek information directly related to guest safety, and undermines rather than protects the security of hosts.  (*See supra* Background, Section D.)  This mismatch heightens the need for precompliance review.  *See Patel*, 135 S. Ct. at 2452-53 ("Absent an opportunity for precompliance review, the ordinance creates an intolerable risk that searches authorized by it will exceed statutory limits, or be used as a pretext to harass hotel operators and their guests.").

in the statute.  *See id*.  This interpretation of the ordinance—also adopted by the City of Santa Monica, which conceded that appropriate process would need to be served in connection with any request for user information—was the sole reason the court concluded that Santa Monica's ordinance did not "violate the SCA or the Fourth Amendment on its face."  *See id.* at *8.  Here, because one cannot credibly argue that the Ordinance authorizes precompliance review—and because the whole point of the Ordinance is to compel disclosure without legal process (unlike the Santa Monica ordinance)—the Homesharing Surveillance Ordinance is invalid under the Fourth Amendment.[9]

**B.    The Homesharing Surveillance Ordinance Violates the New York Constitution**

Like the Fourth Amendment to the U.S. Constitution, Article I, Section 12 of the New York Constitution protects "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures."  N.Y. Constitution, Article I, § 12.

---

[9] As stated above (*see supra* Background, Section D), the Homesharing Surveillance Ordinance is unprecedented not only as compared to how other municipalities have sought to regulate homesharing, but also as compared to how New York City regulates other industries.  In the handful of industries where the Code requires companies to turn over information about the third parties who use their products or services, those requirements are narrowly tailored to specific and legitimate interests on the City's part.  For example, facilities that generate regulated medical waste face detailed disclosure requirements, but those requirements are targeted at information about third parties who transport and dispose of medical waste, and exempt individuals who generate medical waste within their own homes.  *See* N.Y. City Admin. Code § 16-120.1.  Similarly, grocers of a certain size are required to disclose information about their employees in connection with a City program requiring grocers to contribute to employees' healthcare expenses, but again those requirements are focused on information about the employees' jobs and the grocers' healthcare expenses—not home addresses or statements about how individuals are using their private property.  *See id.* § 22-506.  Even lobbyists, who understandably face exacting disclosure requirements in light of the compelling anti-corruption interests at stake, are required only to turn over the business addresses of their clients and the names of the persons or agencies before which they lobby.  *See id.* § 3-216.

At a minimum, the Homesharing Surveillance Ordinance violates Section 12 for the same reasons stated above with respect to the Fourth Amendment.

Moreover, as this Court has recognized, "New York's State Constitution, article I, § 12, affords greater protection against warrantless searches than the U.S. Constitution." *5 Borough Pawn, LLC* v. *City of New York*, 640 F. Supp. 2d 268, 278 (S.D.N.Y. 2009); *see also Scott*, 79 N.Y.2d at 496-97 ("[W]e have not hesitated in the past to interpret article I, § 12 of the State Constitution independently of its Federal counterpart when necessary to assure that our State's citizens are adequately protected from unreasonable governmental intrusions."). As the Court of Appeals has explained, "statutorily authorized administrative searches . . . must be *narrowly and precisely* tailored to prevent the subversion of the basic privacy values embodied in our Constitution," and they can only "pass constitutional muster" where the relevant industry has the aspect of "pervasive governmental supervision." *Scott*, 79 N.Y.2d at 498-99 (emphasis added). For purposes of Section 12, a pervasively regulated industry is one subject to a regulatory scheme that "include[s] detailed standards in such matters as, for example, the operation of the business and the condition of the premises." *Id.* at 499. This "narrowly and precisely" standard is even stricter than the standard under the Fourth Amendment. *See, e.g.*, *id.* at 499-500 (holding that junkyards are not "pervasively regulated" under New York law, even though the U.S. Supreme Court had held that they were closely-regulated under the Fourth Amendment).

Thus, even if the Homesharing Surveillance Ordinance somehow passed muster under the Fourth Amendment (and it does not), the Homesharing Surveillance Ordinance would still violate Article I, Section 12 of the New York Constitution. Homesharing services are not subject to "pervasive governmental regulation" in New York State, as there are no general

"detailed standards" for "the operation of the business," nor is there a history of regulation. *See id.* at 499 (noting that even "obligations to register with the government, to pay a fee and to maintain certain prescribed books and records are not, in themselves, sufficient"); *compare Collateral Loanbrokers Ass'n of New York, Inc.* v. *City of New York*, 46 N.Y.S.3d 600, 605 (1st Dep't 2017), *appeal dismissed*, 29 N.Y.3d 974 (2017) (finding pawnbroking business to be "pervasive[ly]" regulated because it "has been subject to thorough regulation for over a century"). Because the Ordinance is neither narrow nor precise, and further provides no limits on the Office of Special Enforcement's use of information obtained from homesharing platforms, or its ability to share that information with other City agencies, the Ordinance also fails to provide any "meaningful limitation" on the scope of searches and does not "guarantee the certainty and regularity of application." *Scott*, 79 N.Y.2d at 499-500 (internal quotation marks omitted). Permitting a search regime of this nature undermines Section 12's "counterbalancing check on what may be done to individual citizens in the name of governmental goals." *Id.* at 500.

C.    **The Homesharing Surveillance Ordinance Is Preempted by the Stored Communications Act**

To address privacy issues unique to modern technology, in 1986, Congress enacted the Stored Communications Act ("SCA"), which adds to Fourth Amendment protections and carefully regulates the disclosure of stored electronic communications. *See Homeaway.com, Inc.* v. *City of Portland*, No. 3:17-cv-00091, 2017 WL 2213154, at *3 (D. Or. May 11, 2017). The SCA was intended to "create[] a set of Fourth Amendment-like privacy protections by statute, regulating the relationship between government investigators and service providers in possession of users' private information." *Sams* v. *Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir. 2013) (quoting Orin S. Kerr, *A User's Guide to the Stored Communications Act, and a Legislator's Guide to Amending It*, 72 Geo. Wash. L. Rev. 1208, 1212 (2004)); *see also Telecommc'ns Regulatory Bd.*

*of P.R.* v. *CTIA-Wireless Ass'n*, 752 F.3d 60, 66 (1st Cir. 2014) (purpose of amending SCA was to "rais[e] the standard for access to transactional data . . . to guard against 'fishing expeditions' by law enforcement").

Specifically, the SCA "imposes on covered entities certain obligations regarding the disclosure and safeguarding of customer and subscriber information." *In re United States for an Order Pursuant to 18 U.S.C. § 2705(b)*, 289 F. Supp. 3d 201, 207 (D.D.C. 2018); *see also id.* at 203 (SCA "bestows upon covered entities greater responsibilities regarding the disclosure and safeguarding of their customers' electronic information," and subjects them to "civil, criminal, and administrative penalties" for any violations). The SCA's rules impose significant constraints on the government's ability to obtain information from covered entities such as Airbnb. *See generally* 18 U.S.C. § 2703.

Because the SCA constitutes the "supreme Law of the Land," U.S. const., art. VI, any state or local law that conflicts with it is necessarily preempted. *See Arizona* v. *United States*, 567 U.S. 387, 398-99 (2012). That includes local laws requiring companies to disclose information under circumstances forbidden by the SCA. *See Telecommc'ns Reg. Bd. of P.R.*, 752 F.3d at 62. This requirement compels a determination that the Homesharing Surveillance Ordinance is facially preempted by the SCA.

1. **Were Airbnb to Comply with the Homesharing Surveillance Ordinance, It Would Violate the SCA**

The Homesharing Surveillance Ordinance conflicts with the SCA because: (1) Airbnb is covered by the SCA; (2) the Ordinance requires Airbnb to turn over user data that may not be disclosed under the SCA unless the government has followed certain procedures; and (3) the Ordinance does not provide any mechanism for the government to follow those procedures. Accordingly, were Airbnb to comply with the Ordinance, it would violate the SCA.

*First*, Airbnb is clearly covered by the SCA.  The SCA's regulatory framework applies to entities that qualify as an "electronic communication service" ("ECS") or a "remote computing service" ("RCS").  *See* 18 U.S.C. § 2702(a).[10]  Airbnb is both an ECS and an RCS because it provides an electronic messaging system to its users and because it stores electronic communications on behalf of its users.  (*See supra* Background, Section B.)  As Judge Howell in the U.S. District Court for the District of Columbia held in a comprehensive decision issued earlier this year, Airbnb qualifies as an ECS provider.  *See In re United States*, 289 F. Supp. 3d at 207-12.  For essentially the same reasons, Airbnb also qualifies as an RCS.  *See id.* at 208 (recognizing that "the difference between ECS and RCS has eroded" due to technological advancements); *see also* Official Transcript of Preliminary Injunction Hearing at 35, *Homeaway.com, Inc.* v. *City of Portland*, No. 3:17-cv-00091-MO, ECF No. 36 (D. Or. Mar. 27, 2017) (finding that HomeAway—a homesharing platform—was both an ECS and RCS for purposes of the SCA).  Therefore, Airbnb must comply with the SCA's procedural requirements in responding to government demands for user information.

*Second*, the Homesharing Surveillance Ordinance requires Airbnb to turn over user data that cannot be disclosed under the SCA unless certain procedural requirements are met.  Indeed, under § 2703(c)(2), even basic user information—such as a subscriber's name, address, and telephone number—may be obtained only if the government presents a grand jury subpoena, trial subpoena, or administrative subpoena authorized by federal or state law, or obtains valid user

---

[10]  An ECS is defined as "any service which provides to users thereof the ability to send or receive . . . electronic communications." 18 U.S.C. § 2510(15).  An RCS is an entity that engages in "the provision to the public of computer storage or processing services by means of an electronic communications system." *Id.* § 2711(2).  Simply put, an ECS provides communication services to users and stores communications temporarily to transmit them, while an RCS stores and processes user information for longer periods.

consent.  This requirement is clearly triggered here:  ECS and RCS providers cannot (and Airbnb does not) without legal process produce all of the information the Ordinance requires, including the host's address, phone number, email address, host identification number, or the fees received by the platform.  *See* 18 U.S.C. § 2703(c).  If Airbnb were to produce the user data required by the Ordinance without legal process or valid consent, Airbnb could face legal action from hosts.  *See* 18 U.S.C. §§ 2702, 2707.

      *Third*, the Homesharing Surveillance Ordinance neither provides nor constitutes a means by which the City can comply with its obligations under the SCA.  While the City can and does serve subpoenas and other legal process in connection with particular investigations or enforcement actions involving Airbnb guests or hosts, the Homesharing Surveillance Ordinance neither contemplates nor provides for any kind of warrant, court order, grand jury request, or administrative subpoena.  This leaves only a single potential mechanism for compliance with the SCA:  user consent.  In a standalone subsection, the Ordinance compels Airbnb to obtain "consent from the person offering [each] unit for short-term rental to provide the [required] information."  N.Y. City Admin. Code § 26-2102(b).  The "consent" required by this provision is invalid under the SCA for two distinct reasons.

      The compelled "consent" is invalid is because the plain text of the SCA allows the government to mandate disclosure of covered information from an ECS or RCS "only when *the governmental entity* . . . has the consent of the subscriber or customer to such disclosure."  18 U.S.C. § 2703(c)(1) (emphasis added); *see also id*. § 2703(c)(2) (permitting government to require disclosure of subscriber information through "any means available under paragraph (1)").  As the court emphasized in *Freedman* v. *Am. Online, Inc.*, "the statute clearly instructs that the burden is on *the governmental entity* to obtain consent."  303 F. Supp. 2d at 129 (emphasis added).

It is therefore insufficient for the City to require Airbnb to obtain advance, blanket "consent" to any disclosure. *See id.* (holding that state officers could not rely on consent that a user had given only to his internet service provider, as the SCA requires that the government *itself* obtain user consent). That is particularly true here, where the Ordinance does not contemplate *any* direct interaction between users of homesharing platforms and the City officials who seek to obtain the users' private information. Indeed, there is a fundamental difference between "the governmental entity" identifying particular information it wishes to obtain and then procuring informed consent "to such disclosure," as expressly required by the SCA, § 2703(c)(1), and the government requiring platforms to obtain blanket "consent" from all users to sweeping disclosure of their private data.

The compelled "consent" also is invalid because it would undermine the structure and purpose of the SCA to let the government *mandate* that covered entities obtain user "consent." The protections set forth in the SCA—including the procedural protections defined by § 2703(c)(1) and incorporated by reference in § 2703(c)(2)—are more than mere formalities. Congress designed them to "(1) protect personal privacy against unwarranted government searches and (2) preserve the legitimate needs of law enforcement." S. Rep. No. 99-541 (1986). These procedural protections thus reflect Congress's judgment about the circumstances in which government actors should be permitted to seize vast quantities of electronically stored information. *See In re Search Warrant Issued to Google, Inc.*, 264 F. Supp. 3d 1268, 1277 (N.D. Ala. 2017).

The Homesharing Surveillance Ordinance undermines that judgment. Indeed, if the City's position were accepted, it is not clear why the City could not, for example, require Amazon or any other online platform to obtain blanket "consent" from its customers and then turn over details of their purchases or other online activity. Such a result is flatly inconsistent with the core purpose of the SCA. As a practical matter, the SCA will mean little if government officials

can obtain unlimited quantities of personal data by engaging in the fiction that ECSs and RCSs have obtained valid "consent" by telling users that their mere use of the platform will constitute sweeping "consent" to ongoing disclosure of their personal data. By requiring Airbnb to obtain such "consent," the City is using its police powers to bypass a federal law that is in place to restrain those very powers.

2. **Because the Homesharing Surveillance Ordinance Stands as An Obstacle to the SCA, It Is Preempted Under the Supremacy Clause**

Federal law preempts state and local laws when they "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399. Obstacle preemption is most readily apparent when local law requires what federal law forbids. Here the conflict is unavoidable: the Homesharing Surveillance Ordinance compels Airbnb to surrender huge swaths of user data without adhering to any of the procedural safeguards that effectuate the SCA's core purpose: "to protect private communications and prevent invasions of privacy." *In re Search Warrant*, 264 F. Supp. 3d at 1277. Accordingly, the Ordinance is facially preempted by the SCA.

This conclusion is supported by the First Circuit's ruling in *CTIA-Wireless Association*. There, Puerto Rico passed the Registry Act, which required telephone companies and other sellers of prepaid cell phones to provide information to the Puerto Rico government about the purchasers of such phones. *See* 752 F.3d at 61. Like the Homesharing Surveillance Ordinance, the Registry Act compelled communication service providers to disclose user information to the government without following the SCA's "requisite process." *Id.* at 65-66. Faced with this conflict between the requirements of state law and federal law, the First Circuit easily concluded that the Registry Act was preempted by the SCA:

> In sum, we find that the SCA clearly prohibits communications providers from disclosing to the government basic subscriber

> information—including a customer's name, address, and telephone number—without a subpoena. Because the Registry Act requires communications providers who sell prepaid phones in Puerto Rico to disclose their prepaid customers' names, addresses, and phone numbers to a governmental entity without a subpoena—or any process whatsoever—the two acts directly conflict. The Registry Act is thus preempted by the SCA . . . .

*Id.* at 68. The same logic should control here.

A decision last year granting a preliminary injunction against a Portland ordinance that barred anyone from publishing advertisements for the short-term rental of property without first disclosing extensive user information to the city government is also instructive. *See Homeaway.com, Inc.* v. *City of Portland*, No. 3:17-cv-00091, ECF No. 36 (D. Or. Mar. 27, 2017). After concluding that HomeAway was an ECS and RCS for purposes of the SCA, the court there held that "the information required [by the Portland ordinance] comes within the set of information that the [SCA] protects from disclosure, and therefore the disclosure of it, absent . . . following the procedure required by the act, none of which is present here, does violate the [SCA]." *Id.* at 35-36. On that basis, the court preliminarily enjoined Portland's mandatory disclosure provisions for homesharing platforms. *See id.* at 35-38. Similarly here, because the Homesharing Surveillance Ordinance does not "follow[] the procedure required by the act," it is facially preempted by the SCA.

### D. The Homesharing Surveillance Ordinance Violates the First Amendment

As noted above, in its transparent attempt to nullify the SCA's user consent requirement, the Homesharing Surveillance Ordinance requires Airbnb to communicate a specific message to its hosts that Airbnb would not otherwise choose to communicate. Specifically, the Ordinance requires Airbnb to tell all of its New York City hosts that (1) they must consent to the disclosure of their sensitive personal data to the City, (2) their use of the platform will constitute "consent" to that disclosure, and (3) the disclosure will be to an agency widely known for targeting

hosts. *See* N.Y. City Admin. Code § 26-2102(7)(b). By unequivocally compelling Airbnb to communicate what amounts to a threat on behalf of the City, the Ordinance "mandate[s] speech" that Airbnb "would not otherwise make." *See Riley* v. *Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 795 (1988); *see also Becerra*, 138 S. Ct. at 2371 (striking down regulation that "compel[s] individuals to speak a particular message").

It is well established that "the creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell* v. *IMS Health Inc.*, 564 U.S. 552, 570 (2011). This protection applies to "commercial speech" by companies such as Airbnb. *See Virginia State Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 761 (1976). And just as the First Amendment forbids censorship, so does it forbid compulsion. *See, e.g.*, *Janus* v. *Am. Fed'n of State, Cty., & Mun. Employees, Council 31*, 138 S. Ct. 2448, 2464 (2018); *Riley*, 487 U.S. at 797-98; *Int'l Dairy Foods Ass'n* v. *Amestoy*, 92 F.3d 67, 71 (2d Cir. 1996) ("The right not to speak inheres in political and commercial speech alike.").

Because the compelled consent provision of the Homesharing Surveillance Ordinance burdens Airbnb's First Amendment rights, it cannot pass constitutional muster if there are "alternatives that would prove less intrusive to the First Amendment's protections for commercial speech." *Rubin* v. *Coors Brewing Co.*, 514 U.S. 476, 491 (1995). Here, there unquestionably is such an alternative. The City appears to have mandated that Airbnb speak because it recognizes that the absence of process or consent is fatal to its Ordinance. But rather than layer a First Amendment violation atop its conflict with the SCA (as well as its Fourth Amendment violation), the City could simply *comply* with the express terms of the SCA and obtain consent from users itself or serve valid legal process for the information it seeks. *See Freedman*, 303 F. Supp. 2d at 129; *see also Telecommc'ns Reg. Bd. of P.R.*, 752 F.3d at 68. As the SCA

provides an "alternative form[] of regulation" that does "not involve any restriction on speech" and is equally "likely to achieve the State's goal," the compelled consent provision of the Ordinance violates the First Amendment. *44 Liquormart, Inc.* v. *Rhode Island*, 517 U.S. 484, 507 (1996).[11]

This constitutional infirmity requires invalidation of the entire Ordinance. Because the compelled consent provision is central to the legal design of the Ordinance, and because the "balance of the [Ordinance] is incapable of functioning independently," a ruling invalidating the compelled consent provision cannot reasonably be cabined to any single provision. *Alaska Airlines, Inc.* v. *Brock*, 480 U.S. 678, 684 (1987)*; see also Murphy* v. *Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1482-84 (2018).

## II.    ONLINE HOMESHARING PLATFORMS AND HOSTS WILL BE IRREPARABLY HARMED ABSENT AN INJUNCTION

To secure a preliminary injunction, Airbnb must show that it is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied."

---

[11] The Homesharing Surveillance Ordinance also violates the First Amendment because it does not "directly advance" a "substantial" government interest. *See Cent. Hudson Gas & Elec. Corp.* v. *Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 564-65 (1980). To the extent the City purports to claim an interest in combatting "illegal hotels," compelling Airbnb to communicate a threatening message to all of its users does not "directly" advance that interest. Nor is the compelled consent provision of the Ordinance "narrowly drawn"—that is, not "more extensive than necessary"—to combat illegal hotels. *United States* v. *Caronia*, 703 F.3d 149, 164 (2d Cir. 2012) (citations omitted). The compelled consent provision requires Airbnb to communicate a threatening message to *all* hosts, even those in single- or two-family homes that are not covered by the New York State Multiple Dwelling Law's permanent occupancy requirement. And it requires transaction reports to be disclosed even where the short-term rental is offered for "boarders, roomers or lodgers" lawfully staying in the host's household. *See* N.Y. Mult. Dwell. Law §§ 4(5), 4(8)(a)(1)(A); N.Y. City Admin. Code § 27-232; N.Y. City Admin. Code, tit. 28, ch. 7, Build. Code § 310.2.

*Brenntag Int'l Chems., Inc.* v. *Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).  A plaintiff need show only "a *threat* of irreparable harm, not that irreparable harm already [has] occurred." *Mullins* v. *City of N.Y.*, 626 F.3d 47, 55 (2d Cir. 2010) (emphasis in original).  Here, Airbnb is likely to suffer irreparable harm in multiple ways.

*First*, as explained above, the Homesharing Surveillance Ordinance will subject Airbnb to ongoing violations of its rights under the First Amendment and the Fourth Amendment, as well as Section 12.  This alone is sufficient to satisfy the requirement of irreparable harm.  As the Second Circuit has explained, "when an alleged deprivation of a constitutional right is involved . . . no further showing of injury is necessary" to justify issuance of a preliminary injunction.  *Mitchell*, 748 F.2d at 808; *see also Jolly* v. *Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996); *AFDI*, 880 F. Supp. 2d at 465 (Engelmayer, J.) ("Where infringement of free speech is claimed, irreparable harm may normally be presumed, and the Court does so here.").  That is particularly true when the challenged conduct involves an "*ongoing* constitutional violation."  *Hardy* v. *Fischer*, 701 F. Supp. 2d 614, 619 (S.D.N.Y. 2010) (emphasis added).  Courts in this Circuit have held that even the *possibility* of a violation of constitutional rights is sufficient to demonstrate irreparable harm.  *See Covino* v. *Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992); *Ligon* v. *City of New York*, 925 F. Supp. 2d 478, 539 (2013); *Dodge* v. *County of Orange*, 282 F. Supp. 2d 41, 72 (S.D.N.Y. 2003).

*Second*, absent an injunction, Airbnb will either risk ruinous penalties or undertake the significant costs of compliance with a requirement that is clearly preempted by federal law.  *Morales*, 504 U.S. at 381 (finding irreparable harm where respondents had to either "continually violate the Texas law and expose themselves to potentially huge liability; or violate the law once as a test case and suffer the injury of obeying the law during the pendency of the proceedings");

*see also Satellite Television of N.Y. Assocs.* v. *Finneran*, 579 F. Supp. 1546, 1551 (S.D.N.Y. 1984). In addition, if Airbnb complies with the Ordinance and discloses host data without legal process or valid "consent," Airbnb could face host lawsuits under the SCA. *See* 18 U.S.C. §§ 2702, 2707.

        *Third*, by conscripting Airbnb to disclose its hosts' personal data, the Ordinance threatens to poison Airbnb's relationships with its hosts beyond repair. *See Stuhlbarg Int'l Sales Co.* v. *John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."); *Tom Doherty Assocs.* v. *Saban Entm't, Inc.*, 60 F.3d 27, 37-38 (2d Cir. 1995) (injunctive relief appropriate "[w]here the availability of [the] product is essential to the life of the business"). This harm is not theoretical—it is already a very real and practical risk now that the provisions of the Ordinance are becoming publicly known. Hosts, understandably concerned about government surveillance, may simply walk away from homesharing. They may worry, for example, about the government (or anyone else with whom the Office of Special Enforcement chooses to share the data) figuring out intimate details about them (like their address, phone number, email, and bank account information), as well as how they use their private property, whether and when they invite people into their homes, and when they tend to be home and away.

        Finally, the Homesharing Surveillance Ordinance expressly carves out hotels and thus risks distinct competitive harms. N.Y. City Admin. Code § 26-2103 (hotel carve out). That possibility is particularly disturbing in light of the close connection between hotel industry lobbyists and the Office of Special Enforcement officials charged with implementing the Ordinance. The threat that Airbnb's competitively sensitive information will be disclosed to other market actors that see homesharing as a competitive threat poses a unique danger. In fact, given the history of coordinated efforts to injure Airbnb and disrupt its business, there is sound reason to

believe that inflicting irreparable competitive injury on homesharing platforms is one of the Ordinance's main objectives.[12]

## III.    THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST FAVOR AN INJUNCTION

In considering whether to issue an injunction, "[t]he Court should balance the equities to reach an appropriate result protective of the interests of both parties." *Sterling Drug, Inc.* v. *Bayer AG*, 14 F.3d 733, 747 (2d Cir. 1994). For Airbnb, a preliminary injunction is the only way to protect it from a loss of important constitutional rights, from being subjected to enforcement of a local ordinance that is preempted by federal law, and from lost business and competitive harm. In contrast, the City faces no harm from maintaining the status quo while the issues in this case are adjudicated. *See, e.g.*, *AIM Int'l Trading, L.L.C.* v. *Valcucine S.p.A.*, No. 02-cv-1363, 2002 WL 1285557, at *6 (S.D.N.Y. June 11, 2002) ("[T]he Court concludes that the balance of equities tips firmly in plaintiffs' favor[;] if the status quo is not preserved, their business will be eliminated."). The City can issue compliant legal process for data in connection with investigations or enforcement actions against persons engaged in allegedly unlawful activity. And, even if inability to enforce the Homesharing Surveillance Ordinance and collect potential penalties constituted harm to the City, where there is "a conflict between the [government's] financial and

---

[12] The Homesharing Surveillance Ordinance will take effect on February 2, 2019. *See* Local Law 2018/146, § 2. But the harm is already accruing now. Courts routinely issue preliminary injunctions to prevent the enforcement of laws before their effective dates, especially in cases where—as here—fundamental constitutional rights are at stake. *See, e.g.*, *Batalla Vidal* v. *Nielsen*, 279 F. Supp. 3d 401, 438 (E.D.N.Y. 2018); *Newland* v. *Sebelius*, 881 F. Supp. 2d 1287, 1294-95 (D. Colo. 2012), *aff'd*, 542 F. App'x 706 (10th Cir. 2013); *Planned Parenthood of Heartland* v. *Heineman*, 724 F. Supp. 2d 1025, 1048-50 (D. Neb. 2010). That is particularly true where—as here—entities subject to a new statute must engage in "extensive planning involved in preparing" for the regulations, and there is "uncertainty that th[e] matter will be resolved before the . . . effective date." *See Newland*, 881 F. Supp. 2d at 1294-95. To be in a position to comply with the Homesharing Surveillance Ordinance on February 2, 2019, Airbnb must immediately begin taking steps to prepare, at significant cost to the company. *See* Countryman Decl. ¶ 25.

administrative concerns on the one hand, and the risk of substantial constitutional harm to plaintiffs on the other . . . the balance of hardships tips decidedly in plaintiffs' favor." *Mitchell*, 748 F.2d at 808.

The public interest also strongly favors issuance of an injunction here. A City Ordinance that tramples on constitutional privacy rights and is preempted by federal law cannot be in the public interest. The public interest is served "by enjoining the enforcement of the invalid provisions of [local] law," and the City "does not have an interest in enforcing a law that is likely constitutionally infirm." *Chamber of Commerce of U.S.* v. *Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010); *see also Amarin Pharma Inc.* v. *U.S. Food & Drug Admin.*, 119 F. Supp. 3d 196, 237 (S.D.N.Y. 2015) (Engelmayer, J.) ("Here, the equities, including the public interest, strongly favor granting [Plaintiff] relief. Doing so would eliminate the chill on [Plaintiff's] First Amendment rights. This serves the public interest, because securing First Amendment rights is in the public interest . . . and the Government does not have an interest in the unconstitutional enforcement of a law." (citation omitted)); *Ligon*, 925 F. Supp. 2d at 541 (finding that "the public interest in liberty and dignity under the Fourth Amendment trumps" the purported safety benefits put forth by the City). In fact, the public interest will best be served by "the Constitution's declaration that federal law is to be supreme." *Am. Trucking Ass'ns.* v. *City of Los Angeles*, 559 F.3d 1046, 1059-60 (9th Cir. 2009); *see also Bank One, Utah* v. *Guttau*, 190 F.3d 844, 847-48 (8th Cir. 1999) ("[T]he public interest will perforce be served by enjoining the enforcement of [preempted] state law").

## CONCLUSION

The Court should grant Airbnb's motion and preliminarily enjoin the Homesharing

Surveillance Ordinance.

Dated: New York, New York
August 30, 2018

/s/ Roberta A. Kaplan
Roberta A. Kaplan
John C. Quinn
KAPLAN, HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
(212) 763-0883
rkaplan@kaplanhecker.com
jquinn@kaplanhecker.com

Sharon L. Nelles
John G. McCarthy
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
(212) 558-4000
nelless@sullcrom.com
mccarthyj@sullcrom.com

*Attorneys for Plaintiff Airbnb, Inc.*