UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AIRBNB, INC., | 18 Civ. 7712 (PAE) |
| Plaintiff, | 18 Civ. 7742 (PAE) |
| -v- | <u>OPINION & ORDER</u> |
| CITY OF NEW YORK, | |
| Defendant. | |
| HOMEAWAY.COM, INC., | |
| Plaintiff, | |
| -v- | |
| CITY OF NEW YORK, | |
| Defendant. | |

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  1/3/2019_____

PAUL A. ENGELMAYER, District Judge:

This decision resolves motions by two home-sharing platforms, Airbnb, Inc. ("Airbnb")

and HomeAway, Inc. ("HomeAway") (together, "plaintiffs" or "the platforms") to preliminarily

enjoin a New York City (the "City") ordinance that would require them on a monthly basis to

turn over voluminous data regarding customers who use their platforms to advertise short-term

rentals ("hosts").  Absent an injunction, the ordinance, Local Law 2018/146, N.Y.C. Admin.

Code § 26-2101-5 ("Local Law 146" or the "Ordinance"), is scheduled to take effect on February

2, 2019.

For the reasons that follow, the Court preliminarily enjoins the Ordinance from taking

effect.  This matter will now proceed expeditiously to discovery aimed at enabling the Court to

rule on the platforms' application for permanent relief.

1

# I. Factual Background[1]

## A.      Background on Airbnb and HomeAway

Airbnb and HomeAway are home-sharing services that provide an online marketplace for short- and long-term lodging, in which hosts lease or sublease their living space to guests.  *See* Countryman Decl. ¶ 2; Furlong Decl. ¶¶ 4, 6.  Airbnb and HomeAway do not offer their own real estate listings.  Rather, they act as brokers and receive commissions for transactions executed over their platforms.  Furlong Decl. ¶ 8.[2]

To use Airbnb, whether as a guest or host, an individual must register as a member.  To register, Airbnb members submit identifying information and accept Airbnb's various terms and conditions.  These include its Community Commitment, Terms of Service, Payments Terms of Service, Privacy, and Nondiscrimination Policies.  Countryman Decl. ¶¶ 4–5.

Relevant here, Airbnb's Terms of Service Policy provides that Airbnb's "collection and use of personal information in connection with your access to and use of the Airbnb Platform is

---

[1]  Unless otherwise specified, all docket entries refer to the docket in case number 18 Civ. 7712, the first of these two related cases assigned to this Court.  The Court draws its account of the facts from the submissions on the motions for a preliminary injunction, including plaintiffs' complaints, *see* Dkt. 1 ("Airbnb Compl."); No. 18 Civ. 7742, Dkt. 1 ("HomeAway Compl."); the Declaration of David Countryman in support of Airbnb's motion, *see* Dkt. 15 ("Countryman Decl."), and attached exhibits; the Declaration of John C. Quinn in support of Airbnb's motion, *see* Dkt. 16 ("Quinn Decl."), and attached exhibits; the Declaration of William Furlong in support of HomeAway's motion, *see* No. 18 Civ. 7742, Dkt. 11 ("Furlong Decl."), and attached exhibits; the Declaration of Christian Klossner in opposition to plaintiffs' motions, *see* Dkt. 25 ("Klossner Decl."), and attached exhibits; and the Declaration of Karen B. Selvin in opposition to plaintiffs' motions, *see* Dkt. 26 ("Selvin Decl."), and attached exhibits.  The Court also draws on the parties' letters, submitted after the October 5, 2018 hearing, regarding the City's use in the past of subpoenas to gather information regarding certain listings made available on Airbnb and HomeAway's platforms.  *See* Dkts. 72 ("Airbnb Subpoena Letter"); 73 ("City Subpoena Letter"); 90 ("City Supplemental Subpoena Letter"); No. 18 Civ. 7742, Dkt. 48 ("HomeAway Subpoena Letter").

[2]  HomeAway also allows hosts to purchase subscriptions to list their properties for a specified period of time, such as a year.  Furlong Decl. ¶ 9.

described in our Privacy Policy." *Id.* ¶ 6; *id.* Ex. A ("Airbnb Terms of Service") at 3.  Airbnb's

Privacy Policy, in turn, provides that Airbnb will disclose users' personal information only in

response to valid legal requests, including those from government agencies.  Countryman Decl.

¶ 7; *id.* Ex. B ("Airbnb Privacy Policy") § 3.5.  Acceptance of these terms and conditions is

mandatory to use Airbnb's platform.  Countryman Decl. ¶¶ 4–5.

     To become an Airbnb host, a user must create a listing that includes a description of the

property available for rental, images and videos of the property, rental price quotes, and dates of

availability.  *Id.* ¶ 11.  Listings do not include a host's full name, email address, telephone

number, or the rental property's exact address; Airbnb securely stores that information.  *Id.* ¶ 12.

Guests and hosts may privately communicate with each other over the platform.  If they reach an

agreement, Airbnb will disclose the listing address to the guest.  *Id.*  Airbnb also acts as a

platform through which the guest electronically pays the host.  *Id.*

     The process of listing or renting real estate on HomeAway's platform is broadly similar.

To list a rental property, a host registers for an account and provides identifying information,

including a name, email, address, phone number, and other details.  Furlong Decl. ¶¶ 9, 17.

     To use HomeAway's platform, users must accept HomeAway's Terms and Conditions

and Privacy Policy.  HomeAway's Terms and Conditions Policy provides, *inter alia*, that hosts

"are responsible for and agree to abide by all laws, rules, ordinances, or regulations applicable to

the listing of their rental property and the conduct of their rental business." *Id.* ¶ 13; *id.* Ex. A

("HomeAway Terms and Conditions") at 3.  HomeAway's Privacy Policy provides, *inter alia*,

that HomeAway "may disclose [users'] personal data to enforce our policies, or where we are

permitted (or believe in good faith that we are required) to do so by applicable law, such as in

response to a request by a law enforcement or governmental authority . . . ."  Furlong Decl. Ex. B ("HomeAway Privacy Policy") at 3.

HomeAway hosts provide information about the listings, including a description of the rental property, the length of stay, pricing and availability, and "house rules."  Furlong Decl. ¶ 9. As with Airbnb, HomeAway offers the option of an online payment feature, although such payments are handled by third-party processors.  *Id.* ¶ 11.

HomeAway represents to hosts and guests that it "undertakes significant measures to protect and safeguard this private personal and financial information provided by its customers and users . . . , considers this information to be part of its business records . . . and guards such records from disclosure."  *Id.* ¶ 12.

**B.      Local Law 146**

This case arises out of the City's efforts to regulate home-sharing platforms and the market for peer-to-peer apartment rentals.

In 2010, the New York State Legislature enacted a law prohibiting the rental of most apartments for a period of fewer than 30 days in "Class A" multiple dwellings—*i.e.*, buildings occupied for permanent residence purposes by three of more families living independently— unless a permanent resident remains on the premises.   *See* N.Y. Multiple Dwelling Law § 4(8). The law's stated purpose is to regulate the adverse effects of short-term rentals in residential buildings.  These include "overcrowding of multiple dwelling rooms, inadequate provision for light and air, and insufficient protection against the defective provision for escape from fire, and improper sanitation of multiple dwellings."  *Id.* § 2.  Similarly, City law prohibits the short-term rentals of entire multiple dwelling units and one- and two- family units occupied for permanent residence purposes.  *See* N.Y.C. Admin. Code §§ 28-210.3, 28-118.3.2, 27-2004, 27-265; N.Y.C.

4

Building Code §§ 310.1.2, 310.2.  The City views these regulations as necessary on the grounds that short-term rentals (1) pose health and safety risks to permanent residents and guests; (2) reduce the availability of permanent housing; (3) drive up rents; and (4) adversely impact the character of residential neighborhoods.  Klossner Decl. ¶¶ 3 n.1, 9, 12, 22, 40–41.

In July 2018, in an effort to crack down on short-term rentals that violate the Multiple Dwelling Laws and related regulations, the City Council's Committee on Housing & Buildings proposed the legislation that would become the Ordinance.  The report accompanying the proposed legislation stated that the Ordinance would "further address the adverse effect[s], well-documented by a number of reports issued and studies conducted by both governmental and non-governmental organizations, resulting from conversion of permanent housing to rentals under 30 days."  Klossner Decl. Ex. G ("Committee Report") at 2–3.

On July 18, 2018, the City Council unanimously approved the proposed legislation.  On August 6, 2018, the Mayor signed it into law.  Klossner Decl. ¶¶ 5, 24.  The Ordinance is scheduled to take effect on February 2, 2019.  *Id*. ¶ 5.

Under the Ordinance, "booking services" that, for a fee, provide "one or more online, computer or application-based platforms that individually or collectively can be used to (i) list or advertise offers for short-term rentals, and (ii) either accept such offers, or reserve pay for such rentals," will be required to submit, on a monthly basis, a report of transactions for which they receive fees.  N.Y.C. Admin. Code §§ 26-2101, 26-2102(a).  A "booking service" is defined as a "person who . . . (1) [p]rovides one or more online, computer or application-based platforms that individually or collectively can be used to (i) list or advertise offers for short-term rentals, and (ii) either accept such offers, or reserve or pay for such rentals; and (2) [c]harges, collects or receives a fee for the use of such a platform or for provision of any service in connection with a

short-term rental." *Id.*; § 26-2101. It is undisputed that Airbnb and HomeAway are "booking services" within the meaning of the Ordinance.

Each booking service's monthly transaction reports must include, for every short-term rental listed on the platform:

> (1) The physical address of the short-term rental associated with such transaction, including the street name, street number, apartment or unit number, borough or county, and zip code;
>
> (2) The full legal name, physical address, phone number and email address of the host of such short term rental and the uniform resource locator (URL) and the individualized name and number of such host on such booking service's platform;
>
> (3) The individualized name and number and the URL of such advertisement or listing;
>
> (4) A statement as to whether such short-term rental transaction involved (i) short-term rental of the entirety of a dwelling unit of housing accommodations in a building or (ii) short term rental of part of such unit or housing accommodations;
>
> (5) The total number of days that the dwelling unit, part thereof or housing accommodations in a building were rented as a short-term rental through such booking service's platform;
>
> (6) The total amount of fees received by such booking service for short-term rental; and
>
> (7) If such booking service collects rent for short-term rentals on behalf of such host, (i) the total amount of such rent received by such booking service and transmitted to such host and (ii) the account name and consistently anonymized identifier for the account number for the account used by such host to receive payments from such booking service or, if such booking service provides an explanation why such anonymized identifies are unavailable, the account name and account number of such account.

N.Y.C. Admin. Code § 26-2102(a). The Ordinance requires booking services to turn over this body of information with respect to each listing regardless whether there is any reason to suspect that the listing, or the associated host, is violating the law.

The Ordinance further provides that a booking service "shall obtain, from each host using such booking service to offer, manage or administer a short-term rental, lawful consent to provide the information described in subdivision a to the administering agency." N.Y.C. Admin. Code § 26-2101(b). Such consent, the Ordinance provides, can be obtained by "advising or providing notice to a user of the booking service that new or continuing use of such booking service as a host constitutes consent to such disclosure." *Id*. A booking service's failure to obtain consent "shall not be a defense to a violation" of the reporting requirement. *Id*.

Under the Ordinance, these monthly reports must be produced to the Mayor's Office of Special Enforcement ("OSE"). N.Y.C. Admin. Code § 16-2101. OSE is a governmental entity, established by Mayoral Executive Order No. 96 of 2006 and situated within the Mayor's Office of Criminal Justice, to address quality of life issues in the City, including "illegal hotels, lawless adult establishments, and trademark counterfeiting bazaars." Klossner Decl. ¶ 2; *id*. Ex. A ("OSE Executive Order"). OSE is tasked with enforcing the statutory prohibition against unlawful advertising of illegal occupancies in multiple dwellings. Klossner Decl. ¶ 4. OSE coordinates and conducts joint investigations with various City agencies, including criminal law enforcement agencies, to address unsafe conditions. *Id*. ¶ 3. OSE remedies illegal conditions through administrative enforcement mechanisms or by seeking a court order pursuant to the Nuisance Abatement Law, N.Y.C. Admin. Code §§ 7-701 *et seq*. *Id*.

Non-compliant booking services face penalties under the Ordinance: A booking service that fails to submit required reports on a monthly basis "shall be liable for a civil penalty, to be assessed once per reporting period for each set of records corresponding to a listing which is missing, incomplete, or inaccurate." N.Y.C. Admin. Code § 26-2104. The penalty per violation

is the greater "of $1,500 or the total fees collected during the preceding year by the booking service for transactions related to the listing."  *Id.*

### C.    This Litigation

#### 1.    Airbnb's and HomeAway's Complaints and Applications for Preliminary Relief

On August 24, 2018, Airbnb initiated this action seeking to enjoin enforcement of the Ordinance.  It asserted that the Ordinance violates the First and Fourth Amendments of the United States Constitution and conflicts with the Stored Communications Act, 19 U.S.C. §§ 22701 *et seq*. ("SCA").  *See* Dkt. 1.  The same day, HomeAway initiated a separate action, making similar claims.  *See* No. 18 Civ. 7742, Dkt. 1.

On August 30, 2018, Airbnb moved to preliminarily enjoin the enforcement of the Ordinance.  *See* Dkt. 12.  On September 4, 2018, HomeAway filed its own motion for a preliminary injunction.  *See* No. 18 Civ. 7742, Dkt. 9.

On September 7, 2018, the City moved to consolidate the actions.  *See* Dkt. 22.  On September 11, 2018, the Court granted that request.  The Court also ordered the parties to appear at an October 5, 2018 hearing on the motions for preliminary relief.  *See* Dkt. 23.

On September 24, 2017, the City filed a memorandum of law in opposition to the motions for a preliminary injunction.  *See* Dkt. 27.  On October 1, 2018, plaintiffs filed reply briefs.  *See* Dkt. 47 (Airbnb); No. 18 Civ. 7742, Dkt. 31 (HomeAway).

The Court has also received amicus briefs from NetChoice, *see* Dkt. 32-1; Tech:NYC, *see* Dkt. 30-1; the Community Development Project at the Urban Justice Center, *see* Dkt. 37-1; the Electronic Frontier Foundation, *see* Dkt. 46-2; the Apartment Investment and Management Co., *see* Dkt. 45-1; and Linden Research Inc., OfferUp Inc., and Postmates Inc., *see* Dkt. 54-1.

8

### 2.      Overview of Arguments for Preliminary Relief

Airbnb and HomeAway seek a declaration that the Ordinance is unlawful and a preliminary—and eventually permanent—injunction barring its enforcement.  *See* Airbnb Compl. ¶ 15; HomeAway Compl. ¶ 1.  They depict the Ordinance as the product of a concerted lobbying effort by rival industries aimed at hobbling home-sharing platforms' ability to do business in New York City.  *See* Airbnb Br. at 6–9.  Specifically, they assert that the hotel industry pursued a national lobbying campaign with the goal of impairing home-sharing platforms' ability to compete with traditional hotels.  *See* Quinn Decl. Ex. C (April 16, 2017 Article) at 1 (reporting that presentation minutes for a hotel industry conference stated that a hotel lobbying group was pursuing a "multipronged, national campaign approach at the local, state and federal government" to promote regulations to limit Airbnb's ability to do business).  Plaintiffs further assert that the hotel industry has worked with City regulators to target illegal rental listings.  *See* Quinn Decl. Ex. T (July 12, 2017 Article), at 4 (reporting that hotel industry funds private investigators who alert City regulators to potentially illegal listings).

Airbnb and HomeAway make four arguments as to why the Ordinance is unlawful.

First, the platforms argue, the Ordinance is facially invalid under the Fourth Amendment.  Largely relying on *City of Los Angeles v. Patel*, 135 S. Ct. 2443 (2015), they argue that the Ordinance unconstitutionally compels them to turn over information in which they have a protected Fourth Amendment interest without any opportunity for pre-compliance review before a neutral decision-maker.

Second, for similar reasons, the platforms argue, the Ordinance violates Article I, Section 12 of the New York Constitution, which, like the Fourth Amendment, guarantees the right to be free from unreasonable searches, seizures, and interceptions.  N.Y. Constitution, Art. I, § 12.

Third, the platforms argue, the Ordinance conflicts with, and so is preempted by, the SCA.  Under the SCA, "a provider of remote computing services or electronic communication services to the public shall not knowingly divulge a record or other information pertaining to a subscriber or customer of such service . . . to any governmental entity" unless the user consents or other legal process is observed.  18 U.S.C. §§ 2702(a)(3), (c)(1); 2703(c).  Airbnb and HomeAway argue that the Ordinance conflicts with that provision because it requires booking services to divulge information about customers without a subpoena or other legal process.

Finally, the platforms argue, the Ordinance violates their First Amendment rights because it compels them to communicate to platform users a message that they do not wish to speak: that users must consent to the production to OSE of their personal data, and that use of the platform will constitute consent to that disclosure.

As to the remaining preliminary injunction factors, Airbnb and HomeAway argue that, without such relief, they will suffer irreparable harm and that the balance of hardships tips decidedly in their favor.  They argue primarily that the Ordinance will cause ongoing violations of their constitutional rights.  They also argue that it will force them to incur heavy compliance costs and/or civil fines for noncompliance.  In contrast, they argue, a preliminary injunction will not prejudice the City, because, while the Ordinance's legality is litigated on a full record, the City can continue to investigate violations of the Multiple Dwelling Laws using conventional information-gathering tools such as targeted subpoenas.

### 3.     The October 5, 2018 Hearing on the Motions for Preliminary Relief

On October 5, 2018, the Court held a hearing to discuss issues raised by the preliminary injunction motions.  The hearing covered several topics relevant here.

***Stay of discovery***:  The Court had ordered the parties, before the conference, to confer regarding a discovery schedule.  *See* Dkt. 32.  In a joint letter response, the parties asked that discovery not commence until the Court had resolved the motions for preliminary relief.  The parties stated that "no discovery is necessary in advance of the Court's ruling on the preliminary injunction motions because the issues raised by the motions are primarily legal in nature." Dkt. 38.  The Court's ruling as to preliminary relief, the parties stated, "will significantly inform the nature and scope of discovery."  *Id*.  At the outset of the October 5 hearing, the Court stated that it had agreed to proceed as requested, *i.e.*, to resolve the preliminary injunction motions without discovery and thereafter "have discovery proceed guided by the . . . decision on the motion for preliminary injunction[s]."  Dkt. 80 ("Hr'g Tr.") at 6–7.

***Operation of the Ordinance***:  The Court inquired about the anticipated operation of the Ordinance.  Through counsel, the City represented that (1) OSE anticipates adopting rules that would clarify aspects of the Ordinance, such as the process by which home-sharing platforms are to submit information to OSE; and (2) in the event that a booking service declined to comply with the Ordinance, OSE would not assert a right to attempt on-site seizure of the data.  Instead, the City stated, it expects that OSE would issue a notice of violation and pursue enforcement in a state court of competent jurisdiction.  *Id*. at 14–15.

Asked whether the Ordinance provides an opportunity for pre-compliance review, the City stated that the law does not require and the Ordinance does not provide for such review. However, the City stated, if the law does require pre-compliance review, the instant injunctive action before this Court by Airbnb and HomeAway satisfies this requirement.  *Id*. at 15.

***Monetary penalties***:  The Court inquired how OSE would calculate penalties for noncompliance.  Under the Ordinance, a non-compliant booking service "shall be liable for a

civil penalty, to be assessed once per reporting period [of one month] for each set of records corresponding to a listing which is missing, incomplete, or inaccurate.  The civil penalty shall not be more than the greater of $1,500 or the total fees collected during the preceding year by the booking service for transactions related to the listing."  N.Y.C. Admin. Code § 26-2104.  The Court inquired how OSE construed "listing," a term the Ordinance does not define.

Initially, the City stated that if an apartment were booked multiple times within a month, each booking would constitute a "listing."  Hr'g Tr. at 19.  This led the Court to calculate that, had the Ordinance been in effect in 2016, Airbnb would have faced civil penalties of more than $1 billion for non-compliance.  *Id*. at 20.[3]

Later in the hearing, the City changed course as to its construction of the term "listing." It stated that, in its view, a "listing" is a monthly concept, such that a non-compliant booking service would be subject to a single monthly fine for each residential unit (*i.e.*, apartment) listed for rent on its platform, regardless how many times that unit was booked that month.  *Id*. at 20–24.  On that construction, based on an Airbnb submission indicating that there had been 20,000 such listings in New York in 2015, *see* Quinn Decl. Ex. N (July 21, 2015 Article) at 2, Airbnb would have been subject to an aggregate fine that year of up to $360 million.

Asked about a process for challenging penalties, the City stated that, before a monetary penalty imposed for noncompliance with the Ordinance became final, a home-sharing platform could attempt in state court to challenge its imposition, making equitable arguments.  *Id*.

---

[3] The Court based this calculation on Airbnb's representation that more than 700,000 bookings were executed over its platform in New York in 2016, *see* Countryman Decl. Ex. H ("Airbnb Economic Report") at 32.   The record does not contain sufficient information as to the number of bookings executed over HomeAway's home-sharing platform to permit a comparable fine calculation as to it.

*Alternative investigative techniques*:  The Court inquired into the City's historical use of subpoenas and other means to investigate violations of the Multiple Dwelling Laws.  The City stated that, to date, OSE has issued targeted subpoenas to booking services, which have sought information as to specific landlords, buildings, or neighborhoods.  *Id*. at 57–59.  But, the City stated, information gathering by subpoena is less efficient than obtaining information via the Ordinance, given the large number of listings on home-sharing platforms that the City believes likely violate the Multiple Dwelling Laws.  *Id*. at 69–70, 72.

The Court directed the parties to submit letters quantifying the City's historical use of subpoenas aimed at illegal listings on the Airbnb and HomeAway platforms.  Following the hearing, the parties did so.  The City reported having issued a total of 10 subpoenas to Airbnb, each of which sought information about a specific building or companion buildings.  *See* City Subpoena Letter at 1–5; City Supplemental Subpoena Letter at 1.  The City stated that, although it has eventually obtained compliance with such subpoenas, Airbnb had objected to many of them, requiring enforcement in state court and/or, usually, a negotiated resolution.  *Id*.  Airbnb's letter was in general accord.  *See generally* Airbnb Subpoena Letter.  The City stated that it has issued five subpoenas to HomeAway, each pertaining to a specific building, and that HomeAway has "fully complied and produced records."  *Id*. at 5.  HomeAway's letter was in general accord. *See generally* HomeAway Subpoena Letter.

### D.      OSE's Proposed Implementing Regulations

On November 14, 2018, the City reported that OSE had submitted for publication and comment proposed rules implementing the Ordinance.  *See* Dkt. 88-1 ("Proposed Rules").  While largely reproducing the provisions of the Ordinance, *e.g., id*. at 5–6, and defining certain terms, *e.g., id*. at 4, the Proposed Rules also add certain operational detail.

The Proposed Rules provide that the first transaction report of each booking service is to cover all transactions occurring in the period from February 2, 2019 to March 31, 2019. *Id.* at 5. They specify that the regulated platforms are to submit, via an OSE portal, monthly transaction reports in an electronic format that OSE intends to disclose publicly by February 28, 2019. *Id.* at 5–6. The Proposed Rules allow small platforms (*i.e.*, ones with 20 or fewer hosts) to seek exemption from the duty to file reports in an electronic form. *Id*. at 6. The Proposed Rules define the term "listing" to mean "on online advertisement offering a short-term rental." *Id.* at 4.[4] The Proposed Rules state that civil penalties for failure to comply with the Ordinance are to be "recovered in a proceeding before the office of administrative trials and hearings or in a court of competent jurisdiction." *Id*. at 7. The Proposed Rules further state that information submitted to OSE will "be kept in the confidence of such agency" "[u]nless otherwise required by federal, state or local law." *Id*. at 8. Such information may also be disclosed under the New York State Freedom of Information Law ("FOIL"), depending on OSE's assessment "whether disclosure would constitute an unwarranted invasion of personal privacy"; OSE is to "deny access to those portions of the records that would constitute such an invasion if released." *Id*. at 8–9. Under the Proposed Rules, OSE shall retain all records as long as an investigation involving materials contained in the records remains open, or for a period of three years. *Id*. at 9.

The Proposed Rules are pending. Public comments on them were due December 18, 2018. Airbnb and HomeAway each submitted comments opposing the rules. *See* Dkt. 91 (Airbnb comments); No. 18 Civ. 7742, Dkt. 61-1 (HomeAway comments). They argue, *inter alia*, that the Proposed Rules (1) do not rectify the alleged legal infirmities identified in this

---

[4] This definition leaves opaque whether OSE could impose a separate penalty of $1,500 for each of multiple rentals of a given premises during a given month—a practice the City, at the October 5, 2018 hearing, foreswore.

14

litigation; (2) provide inadequate privacy protections; and (3) give OSE too much discretion in its imposition for civil penalties, including for minor or unintentional errors.

## II.      Applicable Legal Standards for Motions for a Preliminary Injunction

To justify a preliminary injunction, a movant must ordinarily demonstrate: (1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and (3) that the public's interest weighs in favor of granting an injunction. *See Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010) (citation omitted); *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (internal quotation marks omitted).  However, in the instant context—a preliminary injunction "sought against government action taken in the public interest pursuant to a statutory or regulatory scheme"—the alternative showing as to the second, likelihood-of-success, element is unavailable.  Instead, to secure a preliminary injunction, the movant must show a likelihood of success on the merits.  *Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 149 (2d Cir. 1999).

## III.     Likelihood of Success on the Merits

To establish a likelihood of success, plaintiffs "need not show that success is an absolute certainty.  [They] need only make a showing that the probability of [their] prevailing is better than fifty percent."  *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988) (quoting *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985), *overruling on other grounds recognized by United States v. Thorn*, 317 F.3d 107, 117 (2d Cir. 2003)).

Airbnb and HomeAway here argue that, on multiple grounds, their facial challenge to the Ordinance is likely to succeed.

First, they argue, the Ordinance is facially invalid under the Fourth Amendment (and the largely parallel Article I, § 12, of the New York Constitution).[5]  This is so, they argue, because the Ordinance mandates the warrantless seizure of business records protected by the Fourth Amendment, without giving the platforms—the subjects of these "administrative searches"—an opportunity for pre-compliance review before a neutral decision-maker.  Second, the platforms argue, the Ordinance conflicts with, and is preempted by, the SCA.  Finally, the platforms argue, the Ordinance violates their First Amendment rights because it compels them to disseminate messages to their users with which the platforms disagree.  The Court addresses these theories of illegality in turn.

### A.       Fourth Amendment

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV.  By virtue of its incorporation through the Fourth Amendment's Due Process Clause, the Fourth Amendment is binding on states and, relevant here, municipalities such as New York City.  *City of Ontario v. Quon*, 560 U.S. 746, 750 (2010).

### 1.       Does the Fourth Amendment Apply to the Ordinance?

Airbnb and HomeAway's challenge to the Ordinance requires the Court to apply the Fourth Amendment to a novel form of state action: a municipal ordinance that requires each

---

[5] Courts have held that this provision of the New York Constitution "affords greater protection against warrantless searches than the U.S. Constitution."  *5 Borough Pawn, LLC v. City of New York*, 640 F. Supp. 2d 268, 278 (S.D.N.Y. 2009).  Because the Court concludes that plaintiffs are likely to prevail on their Fourth Amendment challenge, it has no occasion to consider whether unique aspects of the analysis under Article I, § 12 make the Ordinance yet more problematic.

participant in an e-commerce industry to produce to a regulator, each month, a large subset of its user database.  The Ordinance realistically could arise only in a world of cyber-stored data, in which e-commerce companies maintain vast electronic databases as to their users, from which they can, if compelled, regularly reproduce voluminous stored data for regulators.

Specifically, the Ordinance compels each home-sharing platform operating in New York City every month to produce to regulator OSE a transaction report that effectively will replicate much of the platform's user database for all New York City rentals.  The City Council did not specify how the platform is to make this production: whether by imaging for OSE the affected portions of its database, or by extracting responsive data and populating an OSE-prepared form with it, or by some other means.[6]  But the data that the platforms must produce is specified.  For each short-term rental, each "booking service" must report:

> (1) the physical address of the rental;
>
> (2) the full legal name, physical address, phone number, and email address of the host and the URL and individualized name and number of the host as used on the platform;
>
> (3) the individualized name and number and the URL of each advertisement or listing;
>
> (4) a statement by the service as to whether the short-term rental transaction involved rental of the entirety of a dwelling unit or part of that unit;
>
> (5) the total number of days that the dwelling unit or part thereof was rented as a short-term rental through the booking platform;
>
> (6) the total amount of fees received by such booking service for the short-term rental; and

---

[6] OSE's pending Proposed Rules do not clarify these mechanics.  They state that platforms are to supply the requested information "electronically through a portal accessible through the administering agency's website," and that the format for this submission will be "prescribed and published" by OSE by February 28, 2019.  Proposed Rules at 6.

(7) the total amount of rent received by the service and transmitted to the host, the account name and account number (or consistently anonymized identifier for the account number) used by the host.

The Ordinance's obligation to produce this data applies to all "booking services" and is of indefinite duration.  The Ordinance does not restrict OSE's use of the booking service's data or OSE's ability to share it with criminal enforcement and other governmental authorities.

A threshold issue—which the parties' briefs largely gloss over—is whether the Fourth Amendment applies at all to the Ordinance.  The Ordinance differs in two major respects from a paradigmatic search or seizure by law enforcement.  First, it does not contemplate physical entry by a state actor onto the premises of the home-sharing platform.  The platform instead, like the recipient of a regulatory subpoena, is ordered to furnish data to the OSE or face financial penalties for failing to do so.  Second, the Ordinance is not the act of an executive branch actor. It is an act of municipal legislation that compels the production of data to an executive branch regulator.  Insofar as the paradigmatic Fourth Amendment search "implies a quest by an officer of the law," *Hale v. Henkel*, 201 U.S. 43, 76 (1906), such as a law enforcement agency, and the paradigmatic Fourth Amendment seizure "contemplates a forcible dispossession of the owner" of the items to be seized, *id.*, the Ordinance is, in these respects, an outlier.

Notwithstanding these features, the Court has little difficulty holding that the Ordinance is a search or seizure within the Fourth Amendment.

As to the absence of physical entry, such entry is not required to trigger application of the Fourth Amendment.  A search or seizure within the Fourth Amendment occurs when the state *either* "physically occupie[s] private property for the purpose of obtaining information," *United States v. Jones*, 565 U.S. 400, 404 (2012), *or* invades a constitutionally protected privacy interest to gather information, *see, e.g.*, *Katz v. United States*, 389 U.S. 347, 360–61 (1967) (Harlan, J.,

concurring); *see also Byrd v. United States*, 138 S. Ct. 1518, 1526 (2018) ("[M]ore recent Fourth

Amendment cases have clarified that the test [derived from *Katz*] most often associated with

legitimate expectations of privacy . . . supplements, rather than displaces, the traditional

property-based understanding of the Fourth Amendment." (internal quotation marks omitted));

*Carpenter v. United States*, 138 S. Ct. 2206, 2213–14 (2018).

　　To be sure, the entry by the state onto private premises for the purpose of seizing records

or other effects represents a particularly acute intrusion on privacy.  *See Oklahoma Press Pub.

Co. v. Walling*, 327 U.S. 186, 204 (1946).  But in a series of cases, the Supreme Court has

recognized that governmental demands for the production of papers in which the holder has a

protected privacy interest also implicate the Fourth Amendment, with some cases deeming such

compulsory legal process to work a "constructive search."  *See, e.g.*, *id.* at 202.  In *Oklahoma

Press*, the Court held that the Fourth Amendment applied to administrative subpoenas *duces

tecum* issued in an investigation into violations of the Fair Labor Standards Act.  *Id.* at 209–10

(upholding subpoenas as reasonable, finding their recitation of "the things required" to be not

excessively indefinite or broad).  In *United States v. Morton Salt Co.*, 338 U.S. 632 (1950), the

Court recognized that the protection of the Fourth Amendment "is not confined literally to

searches and seizures as such, but extends as well to the orderly taking under compulsion of

process."  *Id.* at 651–52.  In *See v. City of Seattle*, 387 U.S. 541 (1967), the Court, in an action

against a warehouse owner for refusing to grant access to a fire inspector, addressed, more

broadly, the application of the Fourth Amendment to administrative demands for corporate

records.  Relevant here, the Court wrote: "It is now settled that, when an administrative agency

subpoenas corporate books or records, the Fourth Amendment requires that the subpoena be

sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will

not be unreasonably burdensome." *Id.* at 544; *id.* n.5 (collecting cases). In *McLane Co., Inc. v. E.E.O.C.*, 137 S. Ct. 1159 (2017), the Court again recognized that agency subpoenas "in a wide variety of . . . contexts . . . implicate the privacy interests protected by the Fourth Amendment." *Id.* at 1169. And, finally, last Term, in *Carpenter*, the Court held that the Fourth Amendment applied where subpoenas were used to obtain, from a third party, cell-site information bearing on a person's whereabouts, and indeed, given the nature of the data sought, that a search warrant was, in the ordinary course, required. *See id.* at 2213 ("When an individual seeks to preserve something as private, and his expectation of privacy is one that society is prepared to recognize as reasonable, we have held that official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." (internal quotation marks omitted)).

This line of authority makes clear that the compelled production from home-sharing platforms of user records is an event that implicates the Fourth Amendment. And, of course, it is long settled that the Fourth Amendment's protection of "papers" covers business records. *See Hale v. Henkel*, 201 U.S. 43, 76–77 (1906); *see also Patel*, 135 S. Ct. at 2453 (applying Fourth Amendment protections to business records); *Marshall v. Barlow's Inc.*, 436 U.S. 307, 311 (1978) (Fourth Amendment protects business property no less than residential property).

As to the fact that the Ordinance is a legislative, rather than executive, act of compulsion, that too does not remove it from Fourth Amendment review. In *Patel*, the Supreme Court considered, as here, a municipal ordinance. The Los Angeles ordinance required hotel operators to record, maintain, and make available for inspection by the police certain information about guests. 135 S. Ct. at 2448–49. The Court evaluated the ordinance on its face, finding facial review permissible, *id*. at 2449–50. It then held the ordinance facially invalid under the Fourth Amendment because it lacked a mechanism for pre-compliance review. *Id*. at 2453–54. In light

of *Patel*, the platforms' facial challenge to the Ordinance here under the Fourth Amendment may similarly proceed.

The City makes two separate arguments—specific to these plaintiffs—why Airbnb and HomeAway do not have, or once had but have relinquished, Fourth Amendment interests in the records covered by the Ordinance.

First, it argues that the home-sharing platforms do not have a protected privacy interest in the data sought by the Ordinance, because this data largely relates to users of the platforms, not the platforms themselves.[7]  That argument is foreclosed by *Patel*.  The data sought there by the municipal regulation—including guests' names and addresses, and details about guests' vehicles—also largely originated with guests, not the hotel operators.  But the Supreme Court in *Patel* implicitly recognized—and the *en banc* decision of the Ninth Circuit, which the Supreme Court affirmed, explicitly held—that the records at issue were ones in which the *hotel owners* had a reasonable expectation of privacy.  As the Ninth Circuit put the point in explaining why the Fourth Amendment protects a hotel from unreasonable seizures of records that it prepares and maintains as to its guests:

> The business records covered by [the challenged ordinance] are the hotel's private property, and the hotel therefore has both a possessory and an ownership interest in the records.  By virtue of those property-based interests, the hotel has the right to exclude others from prying into the contents of its records, which is also the source of its expectation of privacy in the records.

---

[7] To date, no user of any home-sharing platform has sought to participate in this lawsuit. Accordingly, while in theory a user could have brought a Fourth Amendment claim of his or her own, presumably attempting to extend the principles of *Carpenter* to this context, no claim has been made on the pending motions that the Ordinance abridges the Fourth Amendment rights of platform users.  And Airbnb and HomeAway base their challenges to the Ordinance solely on the claim that *their* Fourth Amendment rights in the privacy of their business records would be abridged.  The Court's Fourth Amendment analysis accordingly focuses solely on the claim that the Ordinance impairs the rights of the platforms.

*Patel v. City of Los Angeles*, 738 F.3d 1058, 1061 (9th Cir. 2013) (en banc) (Watford, J.) *aff'd,*

135 S. Ct. 2443.

      Airbnb and HomeAway have a similar privacy interest in the data that New York seeks

as to their users, which closely resembles the data as to hotel guests that Los Angeles sought in

*Patel*.  Like a hotel, a home-sharing platform has at least two very good reasons to keep host and

guest information private, whether as to these users' identities, contact information, usage

patterns, and payment practices.  One is competitive:  Keeping such data confidential keeps such

information from rivals (whether competing platforms or hotels) who might exploit it.  The other

involves customer relations:  Keeping such data private assuredly promotes better relations with,

and retention of, a platform's users.

      For these reasons, as the Ninth Circuit observed in *Patel*, customer-facing businesses,

including in hospitality industries, "do not ordinarily disclose, and are not expected to disclose

. . . commercially sensitive information" such as "customer lists," other customer-specific data,

and "pricing practices."  *Id.* at 1062; *see also See*, 387 U.S. at 543 ("The businessman, like the

occupant of a residence, has a constitutional right to go about his business free from

unreasonable official entries upon his private commercial property."); *Hale*, 201 U.S. at 76–77.

As in *Patel*, where the hotels were held to have a Fourth Amendment interest in the records of

their guests, this Court holds that platforms have privacy interests in their user-related records

that "are more than sufficient to trigger Fourth Amendment protection."  *Id.* at 1062.[8]

---

[8] Separately, some data the Ordinance seeks from "booking services" appears to originate with these services themselves.  For instance, the Ordinance requires these services to disclose "[t]he total amount of fees received by such booking service" per rental.  N.Y. City Admin. Code § 26-2102(a)(6).  This reinforces that the Ordinance implicates cognizable Fourth Amendment interests of the platforms.

Second, the City argues, even if the Ordinance effects a seizure of material otherwise protected by the Fourth Amendment, Airbnb and HomeAway have forfeited the right to claim a privacy interest in these records.  They have done so, the City argues, in two ways.  First, by policy, each platform has alerted users that if it is required or permitted to do so by law, it may disclose customer information to regulators.  *See* Airbnb Privacy Policy § 3.5; HomeAway Privacy Policy at 3.  Second, when confronted with subpoenas for such data from OSE, the platforms historically have complied, and, either promptly or eventually, have "disclose[d] their customers' personal information to third-parties, including governmental entities, based on their consumers' consent."  City Opp. Br. at 14–15.

This argument is unpersuasive.  To the extent the City relies on policies of Airbnb and HomeAway that alert users that the platforms may be obliged to disclose user data to regulators, these bear on whether *users* of the platforms, having relinquished data to third party repositories such as Airbnb or HomeAway, may claim a reasonable expectation of privacy as against the platforms' disclosure of such data in response to lawful process.  *See, e.g.*, *Carpenter*, 128 S. Ct. at 2216 ("We have previously held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties.  That remains true even if the information is revealed on the assumption that it will be used only for a limited purpose." (internal quotation marks and citations omitted)).  But that quotidian notification to customers does not deprive the *platforms* of the right to claim a reasonable expectation of privacy in their business records chronicling their dealings with customers.  It certainly does not disable the platforms from claiming that a search or seizure was unlawful.

To the extent the City relies on the platforms' past compliance with subpoenas, the record reflects that such subpoenas to date have been limited in number and targeted in scope.  The City

has not identified any instance in which Airbnb or HomeAway, when not subject to compulsion

by legal process, has voluntarily disclosed user data such as that covered by the Ordinance.  The

platforms' compliance with valid subpoenas did not relinquish, as against any future demand for

user-related records, their Fourth Amendment interest in such materials.  It did not relinquish the

platforms' right to challenge the far more sweeping monthly seizures the Ordinance compels.

Much as compliance with one subpoena does not preclude an entity from challenging a later

subpoena, so, too, each platform retains the right to challenge under the Fourth Amendment the

new Ordinance compelling the monthly surrender of vastly larger amounts of user data.

The Court, finally, considers an argument the City disclaimed at the October 5 hearing,

Hr'g Tr. at 67, but which it had earlier appeared to embrace.  In its memorandum of law, the City

defended the Ordinance by citing "certain administrative search" cases upholding regulatory

seizures of business records on the grounds that companies in historically closely regulated

industries have diminished privacy interests in their records.

The cases to so hold, however, have arisen only in limited industries: mining, firearms,

liquor, and junkyards.  *See Donovan v. Dewey*, 452 U.S. 594 (1981) (mining); *United States v.*

*Biswell*, 406 U.S. 311 (1972) (firearms); *Colonnade Catering Corp. v. United States*, 397 U.S. 72

(1970) (liquor sales); *New York v. Burger*, 482 U.S. 691 (1987) (automobile junkyard).  The City

does not point to a comparable history of close regulation of hospitality industries generally or of

home-sharing services specifically.  And in *Patel*, the Supreme Court explicitly rejected the

argument that the hotel industry was closely regulated so as to deprive hotel proprietors of a

reasonable expectation of privacy in the records they hold as to their guests.  135 S. Ct. at 2454–

56.  The Court explained that the hotel industry does not involve inherently dangerous operations

24

or have a history of pervasive regulation.  *Id*. at 2455.  The analysis in *Patel* equally applies to the peer-to-peer housing market.  It disposes of any like claim the City might make here.

The Court, therefore, holds that the Ordinance implicates the Fourth Amendment.  It puts in place a search and seizure regime that implicates protected privacy interests of the "booking services" whose user records must be produced monthly to the OSE.  The Court now considers whether this regime satisfies the Fourth Amendment.

### 2.        Is the Ordinance Reasonable?

The Fourth Amendment's central command is that official searches and seizures be reasonable.  *See, e.g.*, *Riley v. California*, 134 S. Ct. 2473, 2482 (2014) ("[T]he ultimate touchstone of the Fourth Amendment is reasonableness." (internal quotation marks omitted)); *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 619 (1989) (Fourth Amendment proscribes only searches and seizures "that are unreasonable").  The Amendment imposes this standard of reasonableness "to safeguard the privacy and security of individuals against arbitrary invasions."  *Delaware v. Prouse*, 440 U.S. 648, 654 (1979) (internal quotation marks, footnote, and alterations omitted).  The permissibility of any governmental search scheme "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests."  *Id*.

In the context of criminal investigations, this balance is ordinarily struck "in favor of the procedures described by the Warrant Clause of the Fourth Amendment."  *Skinner*, 489 U.S. at 619.  In the criminal context, "warrantless searches are per se unreasonable under the Fourth Amendment" unless a "specifically established and well-delineated exception[]" applies, such as for exigent circumstances.  *Quon*, 560 U.S. at 760 (internal quotation marks omitted); *see also Katz*, 389 U.S. at 357; *Arizona v. Gant*, 556 U.S. 332, 338 (2009).  The requirement that, before

conducting a search or seizure, the government demonstrate probable cause and obtain a warrant from a neutral magistrate safeguards "privacy interests by assuring citizens subject to a search or seizure that such intrusions are not the random or arbitrary acts of government agents." *Skinner*, 489 U.S. at 621–22.  The companion requirement that the warrant describe with particularity the place to be searched and the persons or things to be seized ensures that the search is "adequate, but not excessive, for the purposes of the relevant inquiry." *Oklahoma Press Pub. Co.*, 327 U.S. at 209.

Outside the criminal context, however, the Supreme Court, in assessing reasonableness, has not insisted on the procedures described by the Warrant Clause.  As the Court reiterated in *Patel*:  "Search regimes where no warrant is ever required may be reasonable where special needs make the warrant and probable-cause requirement impracticable, and where the primary purpose of the searches is distinguishable from the general interest in crime control." *Patel*, 135 S. Ct. 2452 (internal quotation marks, alterations, and citations omitted).

The Supreme Court's assessment of whether searches and seizures outside of the criminal context are reasonable has always turned on the particular circumstances at hand.  In evaluating the reasonableness of the Ordinance's industry-wide demand for monthly productions of New York City user records to OSE, the Court here has found instructive two related lines of authority involving governmental searches and seizures occurring outside of the criminal context.

The first line of authority involves agency investigative subpoenas and similar process. As reviewed above, the Fourth Amendment applies to such subpoenas.  Its reasonableness command requires an agency subpoena to "be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome." *See*, 387 U.S. at 544.

The second line of authority involves civil administrative inspection schemes, generally known as "administrative searches," undertaken for purposes other than to "search[] for evidence of crime." *Michigan v. Tyler*, 436 U.S. 499, 511–12 (1978).[9]  The Supreme Court initially held, in *Frank v. Maryland*, 359 U.S. 360 (1959), that the Fourth Amendment did not apply to municipal housing inspections.  Eight years later, the Court overturned *Frank* in *Camara v. Municipal Court of the City and County of San Francisco*, 387 U.S. 523 (1967).  *Camara* involved an ordinance that permitted building inspectors to enter and search residential buildings to enforce municipal codes.  Camara, a resident, refused an inspector access to his premises multiple times, demanding that the inspector obtain a warrant.  He was charged with refusing to permit a lawful inspection.  Camara sued, arguing that the search had been unlawful without a warrant and that he could not be prosecuted for blocking an illegal warrantless search.  The Supreme Court agreed.  Although acknowledging that civil searches and seizures need not satisfy the Warrant Clause requirements governing criminal searches, *id*. at 538–39, the Court held that the inspectors were required to obtain an administrative warrant that satisfied a relaxed standard of probable cause.  *See id*. at 538 (holding that probable cause exists to support issuance of administrative warrant where "reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling").  The Court in *Camara*

---

[9] For the purpose of this preliminary injunction decision, the Court assumes *arguendo* that the records produced by home-sharing platforms are intended solely for use in civil enforcement of the Multiple Dwelling Laws.  The limited record at hand does not, however, does not make clear whether and, if so, under what circumstances, OSE, which reports to the Office of the Criminal Justice Coordinator ("OCJC"), would make criminal referrals of users, guests or the platforms themselves based on the materials produced by the platforms.  *See* Hr'g Tr. at 30–32 (statement of counsel for City) (while OCJC is "primarily a policy office" and not "personally involved" with prosecutions, it "focuses on criminal justice issues for the City," and will share information with prosecutors or make criminal referrals when it obtains "relevant information related to a criminal prosecution").  The accessibility to municipal prosecutors and criminal investigators of the materials produced pursuant to the Ordinance is an area for discovery.

emphasized that the availability of "individualized review" before a neutral decisionmaker is vital to making an administrative search reasonable, as such pre-compliance review guards against the unconstrained exercises of "discretion of the official in the field." *Id*. at 532.

See v. City of Seattle, *supra*, was a companion case to *Camara*, decided the same day. *See* extended *Camara*'s holding to commercial premises. Like residents of a home, the Supreme Court reasoned, businesspeople "ha[ve] a constitutional right to go about [their] business free from unreasonable official entries upon [their] private commercial property." 387 U.S. at 543. In *See*, the Court found "strong support" for holding that the Fourth Amendment constrained administrative searches of commercial establishments in its decisions holding that the Amendment limits the compulsory production of documents. It was in that context that the Court articulated the synthesis of precedent quoted above as to agency subpoenas: that "when an administrative agency subpoenas corporate books or records, the Fourth Amendment requires that the subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome." *Id*. at 544. The Court also reiterated the importance of a neutral arbiter: Although an agency may issue a demand for information, the Court held, the demand "may not be made and enforced by the inspector in the field, and the subpoenaed party may obtain judicial review of the reasonableness of the demand prior to suffering penalties for refusing to comply." *Id*. at 544–45.

Eleven years later, in *Marshall v. Barlow's Inc.*, *supra*, the Court applied these concepts anew. It invalidated an administrative search scheme for commercial premises because it authorized the inspection of non-public areas "without a warrant or its equivalent." 436 U.S. at 325. Drawing on *Camara* and *See*, the Court reiterated that "[p]robable cause in the criminal law sense is not required" to justify an administrative warrant. *Id*. at 320. But, the Court held, the

Fourth Amendment ordinarily demands that the government demonstrate to a neutral party that a search is justified by some quantum of individualized suspicion. *See id.* at 323 ("A warrant . . . would provide assurances from a neutral officer that the inspection is reasonable under the Constitution, is authorized by statute, and is pursuant to an administrative plan containing specific neutral criteria."). This requirement, the Court explained, constrains the "almost unbridled discretion" that "executive and administrative officers" otherwise enjoy, and that the Fourth Amendment was intended to eliminate. *Id.* at 323.

To be sure, in some ensuing administrative search cases, the Supreme Court departed from the requirements imposed in *Camara*, *See*, and *Marshall* of a warrant, individualized justification for the search, and an opportunity for pre-compliance review. In particular, the Court has upheld suspicionless searches in cases where "special needs" made it impracticable or unreasonable to require the government to demonstrate individualized suspicion to a neutral decision-maker before conducting the search. *See, e.g.*, *New Jersey v. T.L.O.*, 469 U.S. 325 (1985) (holding that search of student, by school official, does not require warrant because "requiring a teacher to obtain a warrant before searching a child suspected of an infraction . . . would unduly interfere with the maintenance of the swift and informal disciplinary procedures needed in schools"); *O'Connor v. Ortega*, 480 U.S. 709 (1987) (holding that it would be "unworkable" to require public employers to obtain a warrant before searching an employee's desk because it would "seriously disrupt the routine conduct of business and would be unduly burdensome" on employers); *Skinner*, 489 U.S. at 623 (upholding suspicionless blood and urine tests of covered railway workers after certain major train accidents and interests; government interest in dispensing with requirements of warrant and individualized suspicion "is at its strongest when . . . 'the burden of obtaining a warrant is likely to frustrate the government

purpose behind the search'" (quoting *Camara*, 387 U.S. at 533))[10]; *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646 (1995) (upholding school district's student athlete drug policy because student athletes have a reduced expectation of privacy).

The most recent case in the administrative search line—and the one most apposite here—is *Patel*. The Los Angeles ordinance at issue required hotel operators to record specific information about guests—including the guest's name and address, the number of people in the guest's party, the length of stay, the rate charged, and the make, model, and license plate number of the guest's vehicle parked on the hotel property—and to maintain this information on the premises for a 90-day period. 135 S. Ct. at 2447–48. These records, the ordinance provided, "shall be made available to any officer of the Los Angeles Police Department for inspection . . . at a time and in a manner that minimizes any interference with the operation of the business," and a hotel operator's failure to make the records available is a criminal misdemeanor" punishable by up to six months in jail or a $1,000 fine. *Id.* (citing Los Angeles Municipal Code § 41.49(3)(a)).

Resolving a facial challenge based on evidence developed at a bench trial, the Court in *Patel* invalidated the portion of the Ordinance authorizing warrantless inspections on demand, because the Ordinance failed to provide hotel operators with an opportunity for precompliance review. Distilling its administrative search precedents, the Court explained:

---

[10] The Court in *Skinner* and a companion case upholding drug test of customs workers also noted that the subjects of these search has a diminished expectation of privacy by virtue of working in an industry heavily regulated for safety. *See* 489 U.S. at 622–23 ("[T]he expectations of privacy of covered [railway] employees are diminished by reason of their participation in an industry that is regulated pervasively to ensure safety . . . ."); *see also Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 667 (1989) (upholding program of warrantless testing for customs employees; Court notes risk otherwise of loss of evidence and that "every employee who seeks a transfer to a covered position knows that he must take a drug test").

    The Court has held that absent consent, exigent circumstances, or the like, in order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker.  *See See*, 387 U.S. at 545; *Lone Steer*, 464 U.S. at 415 (noting that an administrative search may proceed with only a subpoena where the subpoenaed party is sufficiently protected by the opportunity to "question the reasonableness of the subpoena, before suffering any penalties for refusing to comply with it, by raising objections in an action in district court").  And, we see no reason why this minimal requirement is inapplicable here.  While the Court has never attempted to prescribe the exact form an opportunity for precompliance review must take, the City does not even attempt to argue that § 41.49(3)(a) affords hotel operators any opportunity whatsoever.  Section 41.49(3)(a) is, therefore, facially invalid.

*Id*. at 2452.

    The Court in *Patel* further noted that a hotel owner "who refuses to give an officer access to his or her registry can be arrested on the spot."  *Id*.  Under *Camara*, the Court held, "business owners cannot reasonably be put to this kind of choice."  *See id.* ("'[B]road statutory safeguards are no substitute for individualized review, particularly when those safeguards may only be invoked at the risk of a criminal penalty.'" (quoting *Camara*, 387 U.S. at 533)).  Without an opportunity for precompliance review, the Court held, "the ordinance creates an intolerable risk that searches authorized by it will exceed statutory limits, or be used as a pretext to harass hotel operators and their guests."  *Id*. at 2452–53.

    The Court in *Patel* emphasized that the hotel owner need be afforded only an *opportunity* for preview of the officer's demand to search the hotel registry before facing penalties for non-compliance; actual review "need only occur in those rare instances where a hotel operator objects to turning over the registry."  *Id*. at 2453.  The searches that § 41.49(3)(a) authorized would be constitutional, the Court emphasized, were they accomplished by issuance of an administrative subpoena.  *Id*.  That is because the hotel operator could move to quash such a subpoena before the records sought were searched; and "a neutral decisionmaker, including an administrative law judge, would then review the subpoenaed party's objection before deciding whether the

subpoena is enforceable." *Id*.  Administrative subpoena authority among federal executive branch agencies, the Court noted, is "ubiquitous," confirming "what common sense alone would otherwise lead us to conclude:  In most contexts, business owners can be afforded at least an opportunity to contest an administrative search's propriety without unduly compromising the government's ability to achieve its regulatory aims." *Id*. at 2453–54.  And, the Court noted, precompliance review can be made available by means other than administrative subpoenas. "[W]hatever the precise form, the availability of precompliance review alters the dynamic between the officer and the hotel to be searched, and reduces the risk that officers will use these administrative searches as a pretext to harass business owners." *Id.* at 2454.

The Court now evaluates, in light of these two lines of Fourth Amendment authority, the reasonableness of New York City's Ordinance.

Two features of the Ordinance mitigate the official intrusion on the platforms' privacy and security interests.  First, unlike the administrative inspection schemes at issue in cases like *Camara*, *See*, and *Marshall*, the Ordinance does not entail the on-site presence of state officers or any physical entry into the quarters of the booking services subject to it.  The Ordinance operates more like the agency subpoenas at issue in *Oklahoma Press*, *Morton Salt*, and *McLane Co.*, and discussed in *See*, in that it obliges booking services to produce records to an agency.  Second, the Ordinance does not appear to give OSE discretion as to the information that the booking service is required to produce.  Instead, the Ordinance prescribes that data, with commendable precision. Other potential infirmities aside, the Ordinance thus does not implicate one animating concern of the Fourth Amendment: "random or arbitrary acts of government agents," *Skinner*, 489 U.S. at 621–22, searching a business or residence unguided by "specific neutral criteria," *Marshall*, 436 U.S. at 323.  In these respects, the Ordinance impinges on the protected Fourth Amendments of

subject entities less than the Los Angeles ordinance in *Patel*, which obliged hotels to make their guest records available on demand to police for on-site review.  135 S. Ct. at 2447.

On the other hand, the scale of the production that the Ordinance compels each booking service to make is breathtaking.  Each month, the Ordinance appropriates from every participant in the burgeoning home-sharing industry what is effectively a wholesale replica of that booking service's database as to New York City users.  The information called for appears to capture virtually all monthly information the service receives from each user.[11]  Had it been in effect in 2016, the Ordinance thus would have compelled Airbnb to produce user data as to each of the more than 700,000 bookings executed that year over Airbnb's platform.  *See* Airbnb Economic Report at 32.  The Ordinance does not have a temporal sunset.

In its sweep, the Ordinance dwarfs that of the Los Angeles ordinance at issue in *Patel*. The universality of the Ordinance's monthly production demand (covering all short-term rentals in New York City), the sheer volume of guest records implicated, and the Ordinance's infinite time horizon all disfavor the Ordinance when evaluated for reasonableness under the Fourth Amendment.

Indeed, the Ordinance is the antithesis of a targeted administrative subpoena for business records.  Under the line of cases reviewed above, to satisfy the Fourth Amendment, such a subpoena must have a limited scope, a relevant purpose, and specificity in its demands.  These familiar conditions present "rather minimal limitations on administrative action."  *See*, 387 U.S. at 544–45.  But these limitations protect important constitutional interests in liberty and privacy. The requirement that an agency subpoena be targeted in these ways and not an invitation to a

---

[11] With one exception:  The Ordinance does not require the booking service to reproduce the photographs and videos of the rental unit that accompany its public listing.

fishing expedition—that the agency "delimit the confines of a search by designating the needed

documents in a formal subpoena," *id*.—respects the Fourth Amendment interests of the subject

entity.  It enables a reviewing court to determine whether "compliance will not be unreasonably

burdensome."  *Id*. at 544.

By all appearances, however, the Ordinance is devoid of any tailoring.  On the contrary,

it appears to be the functional equivalent of a legislative edict mandating that OSE issue an

identical subpoena to every covered booking service operating in New York City, every month

starting in February 2019 and extending into perpetuity, calling for production of the prescribed

data as to all New York City users.  In contrast to a tailored subpoena, the Ordinance applies

across-the-board to all short-term listings in New York City.  It does so regardless whether there

is any factual basis whatsoever to suspect that any particular listing, or user, or building, or

complex, at issue is in violation of the Multiple Dwelling Laws.

The City's justification for the Ordinance's sweeping scope is that such a law would

facilitate OSE's enforcement efforts.  The City so explained at the October 5 hearing.  Hr'g Tr. at

45.  By giving OSE access, in substance if not form, to the listings databases of Airbnb,

HomeAway, and other home-sharing platforms, the Ordinance would expedite OSE's mission of

identifying listings that violate the Multiple Dwelling Laws.  The Ordinance would spare OSE

the need to build cases through conventional investigative means.  Instead of developing leads as

to illegal rentals (e.g., from neighbors, coop and condo boards, or other complainants) and then

following up—including by issuing subpoenas to home-sharing platforms targeted to suspect

listings—the OSE could henceforth search the platforms' electronic user records for unlawful or

apparently unlawful listings.

At least on its record developed to date, the City's justification is less than convincing. OSE is able to document, in its history, issuing a combined 15 targeted subpoenas to Airbnb and HomeAway.  This limited track record hardly suggests that compliance with the historical Fourth Amendment standards governing administrative subpoenas, including tailoring, is impractical or destined to be ineffectual.  The City's showing to date has not justified its bid, in the context of information demands to home-sharing platforms, to dispense with these familiar standards.

In its Fourth Amendment jurisprudence, the Supreme Court, in fact, has repeatedly disdained justifications like that offered by the City.  As the Court has repeatedly emphasized, while the Fourth Amendment's reasonableness command must adapt to changing times and technology, the test of reasonableness is not whether an investigative practice maximizes law enforcement efficacy.  Other factors, including the extent of the intrusion on protected privacy interests, weigh heavily, often decisively, in the balance.  *See, e.g.*, *Carpenter*, 138 S. Ct. at 2218 (invalidating, as inconsistent with the "constraints of the Fourth Amendment," warrantless subpoenas for cell-site records, despite the capacity of such "near perfect surveillance" records to help police build cases); *Patel*, 135 S. Ct. at 2456 (rejecting government's defense of municipal ordinance that efficacy of law enforcement operations would be undermined were ordinance invalidated); *Jones*, 565 U.S. at 415–16 (holding that the placement of a GPS tracking device on a vehicle was an unconstitutional search, notwithstanding that GPS devices provided law enforcement a "cheap" means to develop records "and efficiently mine them for information"); *Gant*, 556 U.S. at 349 ("The mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment." (internal quotation marks and alterations omitted)); *Mincey v. Arizona*, 437 U.S. 385, 393 (1978) ("[T]he Fourth Amendment reflects the view of those who wrote the Bill of Rights that the privacy of a person's home and

property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law.")

Here, while granting OSE the run of the vast user databases of platforms like Airbnb and HomeAway would surely aid OSE in its mission to identify and pursue violators of the Multiple Dwelling Laws, no Fourth Amendment precedent countenances this expedient.  The City has not cited any decision suggesting that the governmental appropriation of private business records on such a scale, unsupported by individualized suspicion or any tailored justification, qualifies as a reasonable search and seizure.

The precedents on which the City relies in defending the Ordinance as reasonable are instead far afield.  Some relate to historically heavily regulated industries.  *See, e.g.*, p. 24, *supra*. But, as *Patel* teaches, the hospitality (and, by extension, the home-sharing) industries do not qualify as such.  *See Patel*, 135 S. Ct. at 2454–56.  Others involve idiosyncratic "special needs" such as the drug-testing and school-search precedents.  *See*, *e.g.*, p. 35, *supra.*  But OSE's probe into violations by hosts of the Multiple Dwelling Laws does not implicate the exigencies (such as the risk that evidence will disappear if not promptly seized) on which these decisions have relied in upholding searches despite the lack of individualized suspicion.  OSE has not argued that the records covered by the Ordinance are apt otherwise to disappear.

The Ordinance thus presents, at a minimum, substantial questions as to whether its compelled monthly production of the entirety of booking services' New York City user records is reasonable under the Fourth Amendment.

The Fourth Amendment requirement that there be some form of pre-compliance review exists to ensure that a neutral decisionmaker has evaluated questions such as this.  From the perspective of a booking service, each monthly production obligation under the Ordinance may

be likened to an administrative subpoena from OSE demanding the same materials.  Under the lines of Fourth Amendment case law reviewed above, were Airbnb, HomeAway, or a like platform to receive such a subpoena, the platform would be entitled to litigate the legality of the subpoena before its enforcement in court.  Airbnb in fact has litigated OSE's past subpoenas in this fashion.  And for the reasons above, a platform challenging a demand that it produce a full set of its New York City user records for a given month would have, at a minimum, a substantial argument under the Fourth Amendment that the required production was unreasonable.  The City, however, denied at the October 5 hearing that pre-compliance review is required of the monthly provision of data that the Ordinance compels.  Hr'g Tr. 15; *see also id*. (agreeing that "month-in and month-out, every booking service that's covered simply has to turn over the pool of data described by the law without any intervening judge or magistrate passing judgment on it").

The City is wrong.  As reflected in *Patel*, both lines of pertinent Fourth Amendment case authority—that involving agency subpoenas and that involving administrative inspections—have emphasized the need for some form of pre-compliance review.  *Patel*'s review of this authority, in fact, was the basis of its pronouncement that "the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker."  135 S. Ct. at 2452.  The Los Angeles ordinance's failure to give the hotel owner an opportunity to "have a neutral decisionmaker review an officer's demand to search the registry before he or she faces penalties for failing to comply," made the ordinance facially invalid.  *See id.* at 2453; *see also, e.g.*, *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415 (1984) (holding that the Fourth Amendment requires that subject of an agency demand for production have the opportunity "to question the

reasonableness of the [request], *before suffering any penalties for refusing to comply with it*.") (emphasis added)).

By these standards, New York's Ordinance appears similarly deficient.  The City has not pointed to any provision that puts in place or identifies a mechanism for pre-compliance review. The Ordinance does not provide for a neutral forum before which a booking service could argue, before a monthly production deadline, that the demand for user data was unreasonable under the Fourth Amendment (e.g., because of its scale or lack of tailoring).  Nor does the Ordinance provide for a neutral forum before which a booking service could challenge a penalty for noncompliance imposed by OSE on the grounds that, as in *Camara*, the underlying demand for user records had violated the Fourth Amendment.[12]  And as the colloquy at the October 5 hearing demonstrated, these penalties, of up to $1,500 per listing, could prove punishing, if not an existential threat, to a booking service.  That is so whether a "listing" is defined to refer to each offer of a premises for rental or to refer, in the aggregate, to all offers for that premises each month.  *See* Hr'g Tr. 18–24.

The City has alternatively argued that, if pre-compliance review is required, the Court's evaluation of the Ordinance in this litigation would qualify.  *See* City Opp. Br. at 17.  But any

---

[12] Although the Ordinance does not set out such a review mechanism, at the October 5 hearing, the City stated that after receiving a notice of violation from OSE seeking a civil penalty for non-compliance with the Ordinance, a booking service could go to a "presumably civil court" judge, Hr'g Tr. 15, or "an administrative law judge at oath," *id*. at 17.  The City acknowledged that a booking service could make equitable arguments against the imposition of a civil penalty, such as, for example, where an emergency such as a fire prevented the service from timely complying, or that the penalty was too high.  *Id*. at 16–17.  The City did not, however, acknowledge that, at such a forum, the booking service could litigate the validity under the Fourth Amendment of the Ordinance's monthly demand for production of user data.  *Id*. at 17 (noting that Ordinance expressly bars a booking service from resisting production on grounds that the host did not consent to disclosure, and that "[t]he statute doesn't contemplate any other defenses that a party may raise"); *but see id*. ("Having said that, a judge always has the final say.")

such review by the Court could assess only whether the Ordinance, on its face, was reasonable under the Fourth Amendment.  This Court's facial assessment in this litigation would not give a particular booking service a forum to challenge any particular application of the Ordinance.  Even if the Ordinance were upheld facially, each booking service would have a right to challenge the Ordinance's application to it, in general and monthly, on the grounds that circumstances particular to it (e.g., disproportion between the scope of the production obligation and the suspected violations associated with that service) made the obligation and associated penalties unreasonable.  The Ordinance, however, like the ordinance invalidated facially in *Patel* for this failing, fails to provide a neutral forum in which a booking service could bring such a challenge.

In any event, even if this Court's pre-effective-date assessment of the reasonableness of the Ordinance qualified as constitutionally adequate pre-compliance review, that assessment, albeit on the limited record developed to date, would not assist the City's cause.  On the contrary, the Court's present assessment is that it is likely that the Ordinance's categorical demand that all booking services make sweeping monthly data productions would be held unreasonable under the Fourth Amendment.

The Court largely bases this preliminary judgment on the considerations addressed above: most notably, the scale of the user data compelled to be produced, as measured against the precedents that require that the demands of subpoenas and regulatory searches and seizures be reasonably tailored and that reject governmental attempts to dispense with tailoring in the generalized interest of investigative efficacy.  If each monthly demand is viewed as the functional equivalent of an OSE subpoena to each booking service, as the Court regards as appropriate, the expansive user records required be produced cannot be credibly described as "limited in scope."  *See*, 387 U.S. at 544.  The Ordinance's intrusion on protected Fourth

Amendment interests is all the greater because (1) the user data in question is commercially sensitive and subject to potential disclosure; and (2) the Ordinance's requirement for monthly productions of such data is perpetual.

An historical perspective underscores this overreach.  An attempt by a municipality in an era before electronic data storage to compel an entire industry monthly to copy and produce its records as to all local customers would have been unthinkable under the Fourth Amendment. It would have been out of bounds on the grounds of excessive burden alone.  The more ready ability of a modern company whose business is accomplished through cyber communications to comply with such a demand lessens the burden objection.  But this should not obscure the extent to which the Ordinance departs from Fourth Amendment standards.  A ruling upholding the Ordinance as reasonable would invite municipalities to make similar demands on e-commerce companies, whether by legislation or subpoena, for the routinized production to investigative agencies of broad-ranging records as to all users or customers.  It would invite such productions so as to permit regulators to troll these records for potential violations of law, even as to customers as to which there had been no basis theretofore to suspect any violation of law.

Existing Fourth Amendment law does not afford a charter for such a wholesale regulatory appropriation of a company's user database.  And the implications of upholding the Ordinance give pause, as just a few hypotheticals illustrate.  By the City's logic, a City Council presumably could also compel (1) all online auction services monthly to produce all records of sales by New York City residents, on the premise that such records could assist in finding sellers who evaded capital gain taxes on sales of collectibles; (2) all medical providers monthly to produce all patient records for care rendered in New York City, on the premise that such records could assist in finding instances in which users engaged in up-coding and other health-care fraud; and (3) all

credit card companies monthly to produce all records of expenditures in New York restaurants, on the premise that such records could assist in identifying instances in which commercial income was not reported to tax authorities.  Although the Court does not resolve hypotheticals, these scenarios, and many others that the Ordinance readily conjures, underscore the potential far-reaching implications of the City's position.

On the record at hand, the Court therefore finds it likely that Airbnb and HomeAway will succeed in invalidating the Ordinance as unreasonable under the Fourth Amendment.  That is because (1) the Ordinance lacks a mechanism for pre-compliance review by a neutral of its monthly command that booking services produce their New York City user records; and (2) even if this facial injunctive action were treated as pre-compliance review, the City has not justified its sweeping capture of constitutionally protected records.

**B.      The Stored Communications Act**

The Court turns now to plaintiffs' argument that they are likely to prevail because the Ordinance conflicts with, and is preempted by, the Stored Communications Act.  Although this argument is colorable, the Court is not prepared to conclude that plaintiffs are likely to succeed on their merits of this claim.

The SCA is part of the Electronic Communications Privacy Act (the "ECPA"), which Congress passed in 1986 to "update and clarify the Federal privacy protections and standards in light of dramatic changes in new computer and telecommunications technologies."  S. Rep. No. 99-541, at 1–2 (1986).  The SCA governs the disclosure of user communications and records by providers of a remote computing service ("RCS") or an electronic communication service

("ECS") (collectively, "covered service providers").  *See* 18 U.S.C. §§ 2702–03.[13]  In relevant

part, it provides that covered services may not disclose "a record or other information pertaining

to a subscriber to or customer of such service . . . to any governmental entity," except as

authorized by Section 2703 or "with the lawful consent of the customer or subscriber."  *Id.*

§ 2702(a), (c).  Section 2703, in turn, permits governmental entities to mandate disclosure of

information if, among other processes, "the governmental entity . . . has the consent of the

subscriber or customer to such disclosure."  *Id.* § 2703(c)(1)(C).

Plaintiffs argue that the Ordinance violates the SCA's provision because it requires

home-sharing platforms to produce private consumer information to the City without adhering to

the legal processes specified in the SCA.  In support, plaintiffs cite *Telecommunications*

*Regulatory Board of Puerto Rico v. CTIA-Wireless Ass'n*, 752 F.3d 60, 61 (1st Cir. 2014).  *See*

Airbnb Br. at 27–28; HomeAway Br. at 9–11.  There, the First Circuit held that Puerto Rico's

Registry Act was preempted by the SCA because it would have required cellular service

providers "to disclose their prepaid customers' names, addresses, and phone numbers to a

governmental entity without a subpoena—or any process whatsoever . . . ."  *Id.* at 68.  Plaintiffs

also rely on *Homeaway.com, Inc. v. City of Portland*, No. 3:17 Civ. 91, Dkt. No. 36, at 12–16 (D.

Or. Mar. 27, 2011), in which a district court enjoined a city ordinance on the ground that the

---

[13] The City argues that because plaintiffs bring a facial challenge against the Ordinance, the
Court must determine whether all "booking services," as defined by the Ordinance, necessarily
qualify as an RCS or ECS.  City Opp. Br. at 20–21.  It maintains that the definition of a "booking
service" is not coextensive with a covered service provider under the SCA; a booking service
under the Ordinance need only allow for the listing of short-term rentals for a fee and does not
necessarily need to provide "computer storage or processing services" or "the ability to send or
receive wire or electronic communications."  18 U.S.C. §§ 2510(15), 2711(1)–(2).  The City
appears to concede, however, that plaintiffs qualify as providers covered by the SCA.  City Opp.
Br. at 21 n.16.  Because the Court does not conclude, at this stage, that plaintiffs are likely to
prevail on their challenge to the Ordinance under the SCA, the Court will assume, without
deciding, that each "booking service" subject to the Ordinance is an RCS or ECS.

ordinance, in contravention of the SCA, would have required the plaintiff to provide monthly logs of host information.

Plaintiffs' reliance on this authority is misplaced.  The Ordinance at issue here, unlike the laws at issue in *Telecommunications Regulatory* and *Homeaway.com*, provides that booking services must obtain "from each host . . . lawful consent" to provide the information covered under the statute.  N.Y.C. Admin. Code § 26-2102(b).  The Ordinance does not specify the form such consent must take, but it does provide that consent may include "advising or providing notice to a user of the booking service that new or continuing use of such booking service as a host constitutes consent to such disclosure."  *Id*.

Plaintiffs respond that the Ordinance's consent provision is unavailing under the SCA because the Ordinance does not provide for *valid* consent.  Instead, it forces plaintiffs to require that all users consent to the disclosure of their information as a condition of using plaintiffs' websites.  Airbnb argues that, at least in the context of the Fourth Amendment, "consent [may] not be coerced, by explicit or implicit means, by implied threat or covert force."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973).

On the present record, the Court is unprepared to find that argument likely to prevail.  As the City notes, plaintiffs have not pled facts supporting their claim that hosts would feel coerced to consent to the disclosure of the information covered by the Ordinance.  On the contrary, both Airbnb and HomeAway *already* condition use of their services on hosts accepting privacy policies that, among other things, notify hosts that the information they provide may be disclosed to governmental authorities.  *See* Airbnb Privacy Policy § 3.5. ("Airbnb and Airbnb Payments may disclose your information, including personal information, to courts, law enforcement or governmental authorities, or authorized third parties, if and to the extent we are required or

permitted to do so by law or if such disclosure is reasonably necessary . . . to comply with our

legal obligations . . . ."); HomeAway Privacy Policy at 3 ("We may disclose your personal data

to enforce our policies, or where we are permitted (or believe in good faith that we are required)

to do so by applicable law, such as in response to a request by a law enforcement or

governmental authority . . . ."). Hosts are required to accept these terms as a condition of using

either company's services. *See* Countryman Decl. ¶ 5; Furlong Decl. ¶ 13. Plaintiffs presumably

do not mean to suggest that their own terms and conditions are invalid because users are coerced

to accede to them.

In light of the clear languages of these privacy policies, plaintiffs' terms of service appear

themselves to establish effective user consent to the possibility that information will be disclosed

to governmental entities. *See In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016, 1029 (N.D. Cal. 2014)

(holding that Yahoo Mail users who accepted Yahoo's terms of service consented to the

interception of their emails); *Rousset v. AT&T Inc.*, No. 14 Civ. 843 (LY) (ML), 2015 WL

9473821, at *8 (W.D. Tex. Dec. 28, 2015) (holding that plaintiff adopted Yahoo's terms of

service and so consented to the monitoring of his communications and waived any privacy

protections under the ECPA).

The Court is therefore as yet prepared to conclude that plaintiffs are likely to prevail on

the merits of their facial challenge under the SCA.[14]

---

[14] Plaintiffs make a separate argument why the Ordinance's consent provision does not satisfy
the SCA. The SCA provides that the consent exception applies if "the governmental entity . . .
has the consent of the subscriber or customer to such disclosure." 18 U.S.C. § 2703(c)(1)(C).
Plaintiffs assert that the consent exception is valid only if the government obtains consent
directly from the subscriber; and that the SCA does not permit the government to rely on consent
that the consumer obtained by another (here, the service provider as a condition to use services).

The Court is unpersuaded by plaintiffs' interpretation of § 2703(c)(1)(C). As the City rightly
notes, far from requiring affirmative action by the City to procure consent, the key word in that

### C.      First Amendment

Finally, plaintiffs challenge the Ordinance on First Amendment grounds.  They argue that the Ordinance unconstitutionally requires them to adopt and communicate a message that they would not choose to communicate absent government coercion: that hosts must consent to the disclosure of their personal data to the City and that use of the platform constitutes consent to such a disclosure.  Airbnb Br. at 28–29.  In making this claim, plaintiffs note that the disclosure will be to an agency, OSE, that, in plaintiffs' view, is "widely known for targeting hosts." Airbnb Br. at 28–29.  As HomeAway therefore puts the point, it (and Airbnb) "do[] not want to use [their] speech to serve as the City's enforcement arm."  HomeAway Br. at 20.  Plaintiffs further argue that the Ordinance regulates the content of speech, and the City therefore bears the burden of showing that the Ordinance is narrowly tailored to serve compelling interests.  The City, for its part, argues that the Ordinance does not implicate the First Amendment, both because plaintiffs' existing privacy policies already contain language that satisfy the Ordinance's consent provision so as to make any additional message unnecessary, and because the Ordinance regulates conduct, not speech.  City Opp. Br. at 27.

---

provision—"has"—connotes passive possession, not affirmatively obtaining something.  *See, e.g.*, Oxford Dictionary ("possess, own, or hold"), *available at* http://www.oxforddictionaries.com/us/definition/american_english/has.  *But see Freedman v. America Online, Inc.*, 303 F. Supp. 2d 121, 128–29 (D. Conn. 2004) (interpreting § 2703 and holding that governmental entity did not have the consent of subscriber because it never "sought or obtained" consent directly from the subscriber).  When prospective hosts consent to privacy policies providing that their information may be disclosed to "law enforcement or governmental authorities," Airbnb Privacy Policy § 3.5, or "in response to a request by law enforcement or governmental authority," HomeAway Privacy Policy at 3, the governmental authority can be said to "have" the user's consent to seek such information.

The Court elects not to address the First Amendment question at length here.  Having concluded that Airbnb and HomeAway are likely to prevail on their Fourth Amendment challenge to the Ordinance, it is not necessary to do so.

For avoidance of doubt, the Court is not, at this juncture, inclined to regard the First Amendment claim as likely to prevail.  In particular, the presence in each plaintiff's current privacy policies of substantially comparable disclosures raises a question of whether the City would require anything further from Airbnb and HomeAway to conclude that each was in compliance with the Ordinance.  If the City regarded plaintiffs' present policies as conveying the required message, a question for Airbnb and HomeAway would then be whether, in order to claim that the Ordinance compels unwanted speech, they are proposing to abandon the existing disclosures that the City contends satisfy the Ordinance's directive.

## III.     Other Injunctive Factors and Overall Assessment

### A.      Irreparable Harm

A preliminary injunction will issue only if plaintiffs show that they are "likely to suffer irreparable harm in the absence of preliminary relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Plaintiffs make such a showing if, "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied."  *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).  A plaintiff need only show a "*threat* of irreparable harm, not that irreparable harm already [has] occurred."  *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010).

The plaintiffs here make several arguments why they are likely to suffer irreparable harm absent an injunction.

First, they assert that the Ordinance will subject them to continuing violations of their rights under the Fourth and First Amendments.  *See* Airbnb Br. at 31; HomeAway Br. at 24.  It is well established that "[w]hen an alleged deprivation of a constitutional right is involved . . . no further showing of injury is necessary" to obtain a preliminary injunction.  *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) (internal quotation marks omitted).  Although the Ordinance has not yet gone into effect—it is scheduled to become effective on February 2, 2019—plaintiffs may show irreparable harm by showing that they are "threatened with imminent violations of their constitutional rights in the absence of preliminary relief."  *Ligon v. City of New York*, 925 F. Supp. 2d 478, 539 (S.D.N.Y. 2013).

Such is the case here:  Plaintiffs have argued, and the Court has held, that they are likely to prevail on their claim that the Ordinance violates the Fourth Amendment.  If the Ordinance is permitted to take effect, plaintiffs therefore will likely be subjected to violations of their Fourth Amendment right to be free from unreasonable searches and seizures, each time the Ordinance obliges them to produce user records, an obligation that, under the Ordinance, commences in February 2019.  The constitutional violation would recur each month given the continuing— monthly—obligation to produce such records that the Ordinance imposes.  *See Hardy v. Fischer*, 701 F. Supp. 2d 614, 619 (S.D.N.Y. 2010) ("[A]n ongoing constitutional violation more closely resembles irreparable injury than does a constitutional violation that was suffered in the past and which can be remedied only by money damages.").  Because the threatened, continuous violation of a constitutional right constitutes irreparable harm for purposes of a preliminary injunction motion, plaintiffs have carried their burden of showing that they likely will suffer irreparable harm.

Plaintiffs separately argue that they will suffer irreparable harm if they are compelled to turn over their private business records as to their users, because the confidentiality of those records will be irreversibly lost even if plaintiffs ultimately prevail on the merits of their claim. The disclosure of private, confidential information "is the quintessential type of irreparable harm that cannot be compensated or undone by money damages." *Hirschfeld v. Stone*, 193 F.R.D. 175, 187 (S.D.N.Y. 2000).

Here, the risk of disclosure is imminent; if the Ordinance goes into effect, plaintiffs will be compelled to turn over a voluminous amount of information in which they have a reasonable expectation of privacy, or face hefty fines. The threat to plaintiffs' privacy interests is higher here because, on the record at hand, the Ordinance does not appear to place meaningful limits on the City's ability to disseminate the information it collects, either to other government offices or to the public at large. The Ordinance provides that information collected under it "shall be available for public review only to the extent required by federal, state and local law." N.Y.C. Admin. Code § 26-2105. The City admits that, under this provision, information covered by the Ordinance would be subject to public disclosure under the FOIL. Hr'g Tr. at 33. While the city asserts that it would endeavor to withhold the most sensitive information it collects (for instance, the names and addresses of hosts), there is no guarantee that this would stand in the event that a litigated action were brought against one or more of plaintiffs' hosts that drew upon the data produced. Further, the City acknowledges that other information produced by plaintiffs could be made available to the public, including the total amount of fees plaintiffs collect per listing. *Id*. at 34. By these means, competitors—whether rival home-sharing platforms or members of the hotel industry—could gain sensitive information about the workings of plaintiffs' businesses.

These constitutional and commercial harms, the Court concludes, could not readily be remedied.  Accordingly, plaintiffs have met the irreparable injury requirement for preliminary injunctive relief.

### B.      The Balance of Hardships

In considering whether to preliminarily enjoin the Ordinance, the Court also "must balance the hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor."  *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010).  The Court concludes that the balance of equities strongly favors preserving the status quo and preliminarily enjoining the Ordinance.

As explained above, denial of a preliminary injunction likely would result in the continuous violation of plaintiffs' Fourth Amendment rights.  Plaintiffs' privacy interests in the information covered by the Ordinance would be irretrievably lost; and, once plaintiffs' user records were disseminated to OSE, there would be a material possibility that plaintiffs' competitors could gain access to at least some of this sensitive business information, including via FOIL requests.  Production of the covered material may also impose significant compliance costs (if plaintiffs complied with the Ordinance) or civil penalties (if they did not).  Finally, production by plaintiffs *en masse* of user records to OSE, as required, would present at least some risk of alienating plaintiffs' users.

The City, in contrast, faces only slight hardships if enforcement of the Ordinance is preliminarily enjoined while this case is adjudicated to completion.  Were the City to prevail on the merits, a preliminary injunction would only temporarily delay enforcement of the Ordinance.

To be sure, the City has a legitimate interest, during this period, in enforcing laws such as the Multiple Dwelling Laws to the extent breached by participants in the home-sharing market.

But the City's regulator responsible for enforcing these laws, OSE, already possesses other tools to gather evidence of violations of these laws.  These including the power to issue targeted subpoenas to plaintiffs and others.  It can use these tools to safeguard its interests while this litigation is pending.

The record to date reflects that the City has made only modest use of these tools.  As to subpoenas, relative to the scale of violations of the Multiple Dwelling Laws that the City represents have occurred and are occurring, the City has issued a combined 15 targeted subpoenas—10 to Airbnb and five to HomeAway.  If enforcement in this area is indeed a City priority, the City is at liberty to devote enhanced personnel and investigative resources to this problem, including by issuing more subpoenas to home-sharing platforms as to users or venues where OSE has a basis to believe there have been violations of law.  In any event, to the extent that OSE's interest in maximizing the efficiency of its investigations would be advanced by enforcement of the Ordinance rather than using presently available investigative techniques, that does not outweigh the harms to plaintiffs.  Where there is "a conflict between the state's financial and administrative concerns on the one hand, and the risk of substantial constitutional harm to plaintiffs on the other . . . the balance of hardships tips decidedly in plaintiff's favor." *Mitchell*, 748 F.2d at 808.

Accordingly, the balance of equities strongly favors granting plaintiffs' their requested relief.

### C.      The Public Interest

Finally, the issuance of a preliminary injunction serves the public interest.  The Court has found that Airbnb and HomeAway are likely to succeed on their claim that the Ordinance violates the Fourth Amendment.  Enjoining an unconstitutional regulatory scheme "serves the

public interest . . . because the Government does not have an interest in the unconstitutional enforcement of a law." *Amarin Pharma., Inc. v. FDA*, 119 F. Supp. 3d 196, 237 (S.D.N.Y. 2015) (internal quotation marks and citations omitted); *see also Ligon*, 925 F. Supp. 2d at 541 (finding that the public had strong interest "in liberty and dignity under the Fourth Amendment").

To be sure, the public has an interest in preventing the social ills that may result from the proliferation of short-term rentals in ways that violate the Multiple Dwelling Laws. *See* Klossner Decl. ¶¶ 3 n.1, 9, 12, 22, 40–41 (attesting that unlawful short-term listings create health and safety risks, drive up rent prices, and adversely affect neighborhoods). But, as noted, the issuance of a preliminary injunction ought not to significantly impair the City's ability to safeguard those interests during the pendency of this litigation, as the City retains its existing investigative tools such as subpoenas, and is at liberty to enhance the resources dedicated to this area if it determines that such serves the public interest.

### D.    Overall Assessment

For the reasons reviewed above, the Court holds that each factor relevant to the preliminary injunction inquiry favors granting the requested relief. The Court will therefore issue a preliminary injunction enjoining the Ordinance from taking place pending the resolution of this litigation.

## IV.   Next Steps

This matter will now proceed expeditiously to discovery. The parties previously advised the Court of their shared view that discovery was unnecessary until after the Court had resolved the motions for preliminary relief. *See* No. 18 Civ. 7712, Dkt. 38. Accordingly, the parties' proposed civil case management plan and scheduling order set forth an expedited discovery

schedule, measured by the number of days from the date the Court resolved plaintiffs' motions. The Court has approved that plan and scheduling order.

Consistent with the proposed case management plan, any motion to amend or to join additional parties shall be filed within 30 days of today's order.  The parties shall complete initial disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1) within 14 days of today's order. All fact discovery is to be completed within 100 days of this order, and any expert discovery shall be completed within 145 days of this order.

In accordance with the case management plan, the case management conference is scheduled for May 10, 2019, at 2:30 p.m.  Pursuant to the Court's individual rules, if any party wishes to move for summary judgment, it must, within 14 days of the close of fact discovery, submit a letter to the Court requesting that the case management conference previously scheduled serve as a pre-motion conference.

## CONCLUSION

For the foregoing reasons, the Court grants plaintiffs' motions for preliminary relief.  The court preliminarily enjoins the Ordinance from taking effect pending resolution of this litigation.

The Clerk of Court is respectfully directed to terminate the motions pending at docket number 13 (No. 18 Civ. 7712) and docket number 9 (No. 18 Civ. 7742).


SO ORDERED.

_Paul A. Engelmayer_

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: January 3, 2019
       New York, New York